443 So.2d 512 (1983)
STATE of Louisiana
v.
William Jackson SIMMONS.
No. 82-KA-0588.
Supreme Court of Louisiana.
April 4, 1983.
Rehearing Denied May 13, 1983.
*513 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Carl Parkerson, Dist. Atty., Nancy F. Gilliland, Bruce Whitaker, Asst. Dist. Attys., for plaintiff-appellee.
Albert W. Block, Monroe, for defendant-appellant.
DIXON, Chief Justice.
Defendant, William Jackson Simmons, was charged by amended bill of information[1] filed July 29, 1981 with three counts of simple arson with damage amounting to more than $500 in violation of R.S. 14:52[2] and one count of aggravated arson under R.S. 14:51. On May 20, 1981 a hearing was held on defendant's motion to suppress his confessions. The trial judge overruled the motion, finding that the confessions were freely and voluntarily given. After trial by jury on October 26 through October 29, 1981, defendant was found guilty by a unanimous verdict on both Counts 1 and 4, and by an eleven to one vote on both Counts 2 and 3 (Count 3 was the aggravated arson charge).
On November 24, 1981 defendant's motion for a new trial was heard and denied. Defendant was sentenced on December 16, 1981 on Counts 1, 2 and 4 to ten years at hard labor with a $2000 fine (additional year on default) on each count. On Count 3, the aggravated arson charge, defendant was sentenced to fifteen years at hard labor and fined $5000 (additional year on default). The sentences were to run consecutively.
Simmons now appeals his convictions arguing seven assignments of error.
Defendant was tried for the following offenses: *514 Count 1: Simple arson of the Mini-Togs building on April 19, 1980.
James W. Richards, Deputy City Fire Marshal of the City of Monroe, Louisiana, testified that a fire occurred at the Mini-Togs building, an infant's and children's clothing factory, on April 19, 1980. The fire was primarily located in the rear of the building off of the alley. Even though he did not locate any flammable liquids, any explosives, or "any fire starters of any sort" at the scene, Richards suspected that the fire had a suspicious origin since he "didn't find any natural causes for the fire."[3]
Count 2: Simple arson of the Mini-Togs building on April 27, 1980.
Richards testified that on April 27, 1980 a major fire destroyed the front portion of the same Mini-Togs factory. Again he could not uncover any natural causes for the fire, and so classified the fire as "suspicious." However, he did not discover any evidence that would positively indicate arson.
Hakim, the factory owner, claimed that this fire caused approximately $400,000 in damages. After this fire Hakim "found a five (5) gallon army can that appeared to have about an inch of gasoline in it" at the back door. He informed fire officials at the scene about the presence of the can.[4] In addition the owner mentioned that the building had recently been renovated in compliance with local fire codes and "all materials that were in that building, walls and all, would not burn."
Count 3: Aggravated arson of the Amvets Club on October 28, 1980.
Richards testified that at approximately 7:46 p.m. on October 28, 1980, a fire was reported at the Amvets Club. The fire was minor and was confined to a doorway on the north side of the building. At the time the fire occurred, the club was filled with approximately seventy-five to one hundred twenty-five persons playing bingo. However, none "of the people saw anyone or knew anything about this fire." Again Richards did not discover any natural causes for the fire. Debris gathered from around the doorway smelled like petroleum.
Count 4: Simple arson of Star Hardware on December 24, 1980.
Ronald Weaver, a Monroe police officer, testified that he observed a fire in the rear storage area of Star Hardware during the early morning hours of December 24, 1980. Star Hardware is situated next to the Mini-Togs building and the same alley runs parallel to both establishments.
Richards declared that he was unable to discover any natural causes of the fire since the fire destroyed any evidence that might have existed. He noted that he smelled no unusual odors at the scene. The fire apparently started in the back of the building where some cardboard containers were stored. He characterized the fire as suspicious since "it was so quickly involved." Richards "saw nothing to create that fast a fire." He found no trace of flammable liquids at the scene of the fire.
*515 Argument No. 1 (Assignment of Error No. 1)
By this assignment defendant contends that the trial court erred in denying his motion to suppress his confessions in that they were not knowingly and voluntarily given due to his intoxication.
At the suppression hearing, Sergeant Warren Brown, an investigator with the Monroe Police Department, testified that Simmons had been arrested at 7:15 p.m. on the night of February 5, 1981. Defendant explained the circumstances of his arrest to Sergeant Brown who recalled:
"I told him, I said, `Now, I want to make sure that you're not intoxicated,' that's before we took the statement, I said, `because you've been arrested for D and D.' He said, `I may have been intoxicated a little back,' he said, `but I really wasn't ...' `I knew what I was doing,' he said, `and it was cold ... and I didn't have nowhere to stay, and I called the police department myself and told them that old Bill was down there on Sam's parking lot drunk,' and he said, `and just a few minutes later three or four police cars showed up and they brought me on to jail. That's what I wanted them to do.'"
At approximately 7:30 p.m. Brown, the detective on duty, was informed that defendant, who was in jail, wanted to talk to him. At 9:30 p.m. defendant told Brown that "he wanted to tell [him] about some fires." Specifically, defendant confided in Brown that he wanted to talk about the Star Hardware fire, the two fires at Mini-Togs, and the one at the Amvets Club. Brown then stopped defendant and advised him of his rights. Brown testified that defendant appeared to comprehend his rights and stated that he understood them. Defendant then executed a waiver form.
Brown interrupted their conversation and contacted the State Fire Marshal's Office and asked to have an investigator sent over. After the arrival of Deputy State Fire Marshal Pete Medak, Brown read and explained the Miranda rights to defendant a second time. Medak added his name to the waiver as a witness.
Two recorded statements were made by defendant at 11:10 p.m. and 11:45 p.m. One statement concerned the two fires at Mini-Togs and the fire at the Amvets Club. The other statement concentrated on the Star Hardware fire. Brown affirmed that prior to making the statements, defendant "was very cooperative" and did not "appear to be under the influence of any narcotics or intoxicants of any sort." Brown further asserted that the statements were not obtained by the use of force, promises or coercion. Deputy Medak's testimony corroborated that of Sergeant Brown's in its essentials.
Defendant presented the testimony of two bar owners and a drinking crony which tended to suggest that defendant drank heavily, could carry on a conversation when intoxicated, and laced his conversation with braggadocio when intoxicated.
The trial court, in denying defendant's motion, concluded that while defendant may have been drinking, he was not intoxicated "to the extent that he didn't know enough to understand his rights and give a free and voluntary statement."
Before a confession can be introduced into evidence, the state must affirmatively prove that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. R.S. 15:451; State v. Robinson, 384 So.2d 332 (La.1980). The state must also establish that an accused who makes a confession during custodial interrogation was first advised of his Miranda rights. State v. Kersey, 406 So.2d 555 (La.1981); State v. Robinson, supra.
Intoxication will render a confession inadmissible when the intoxication renders the defendant incapable of understanding his right to remain silent. In State v. Robinson, supra at 335, this court reiterated its standard for determining the effect of intoxication on confessions. There we noted:

*516 "... Where the free and voluntary nature of a confession is challenged on the ground that the accused was intoxicated at the time of interrogation, the confession will be rendered inadmissible only when the intoxication is of such a degree as to negate defendant's comprehension and to render him unconscious of the consequences of what he is saying. Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession are questions of fact. State v. Rankin, 357 So.2d 803 (La.1978). The admissibility of a confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of the testimony relating to the voluntariness of a confession will not be overturned unless they are not supported by the evidence. State v. Hutto, 349 So.2d 318 (La.1977)."
See also State v. Godeaux, 378 So.2d 941, 943 (La.1979); State v. Hammontree, 363 So.2d 1364, 1367-1368 (La.1978).
Although the evidence produced at the hearing established that defendant had consumed alcoholic beverages prior to his arrest at 7:15 p.m.,[5] the evidence also revealed that the confession, given approximately four hours later, was free and voluntary and followed a thorough explanation of the Miranda warnings.
Defense witnesses testified that the speech patterns of the defendant were "slurred" when he was intoxicated. Sam Messina, the owner of Sam's Bar and a past employer of defendant, noted that after drinking heavily, defendant "does not have a consistent train of thought, he goes backwards and forwards and skips back and forth ..."
The testimony of the interviewing officers reveals that defendant, while perhaps intoxicated earlier in the evening, was lucid and able to understand the nature of the Miranda rights, his waiver of them, and the consequences of what he was saying. Their testimony clearly negates any claim of intoxication sufficient to vitiate the voluntariness of the confessions. In addition, a review of the transcribed confessions discloses a coherent colloquy containing minor details of the fire, clearly not indicative of defendant's speech patterns when intoxicated.
Accordingly, the trial court's denial of defendant's motion to suppress is adequately supported by evidence in the record.
This assignment lacks merit.
Argument No. 2 (Assignments of Error Nos. 2, 3 and 4)
By these assignments defendant contends that the trial court erred in denying his mistrial motion based upon allegedly prejudicial remarks made by a prospective juror in the presence of the entire jury venire; that the trial court erred in not polling the jury venire to ascertain whether the statements would prejudice the jury; and that the trial court erred in failing to admonish the jury panel to disregard the statements.
The following occurred during voir dire:
"By Ms. Gilliland:

* * * * * *
Q. Do you know the defendant, Mr. Simmons?
A. Yes, I do.
Q. Do you know him personally?
A. Well, I have been around him. My husband's mother and his mother were close friends and both of them is dead now and I have been visiting his mother, you know, when she would come and there was several times that I visited with her and was at his mother's home and then his brother was a personal friend of my husband and his brother has been in my home several times.
Q. Now, I don't want to embarrass you but I need to know. Do you not feel that the fact that you know him and his family *517 quite well would keep you from being fair and impartial?
A. I know of his background. So I don't know whether I could be partial or fair.
Q. You don't know whether or not you could be fair?
A. I don't know whether I could or not.
Q. Okay. All right.
Ms. Gilliland: Without wanting to embarrass you, Judge, I would challenge Mrs. Auttonberry for cause.
By the Court
Q. Do I understand you, Mrs. Auttonberry, to say that because of facts that you know about him and his family and your relationship to him you can't be sure you could get those out of your mind and relate solely to the evidence?
A. Well, I know what has went on in the past and for that reason I don't know if I could be fair or not.
The Court: Okay. The Court is going to excuse you from this case. Call in tonight and find out about tomorrow, please, ma'am. 
The Court: Let the record show that all prospective jurors are excluded from the Courtroom. All right, Mr. Block.
Mr. Block: Your Honor, at this time I am going to move for the entry of a mistrial as a result of the remarks made by Mrs. Auttonberry concerning her knowledge of Mr. Simmons alleged past history. I believe she used the words `some goings on in the past,' Your Honor. The complete jury panel was present at the time the remarks were made. They were made in open Court. They were made audibly. I am sure everyone heard them. I would submit that there is obviously a prejudicial effect that can result from this statement and that as such, we would be entitled to a mistrial and the empaneling of a new jury.
The Court: Well, I don't recall her having said anything that washad reference to any particular fact other than she knows facts. Let the motion be overruled.
Mr. Block: Note our objection to the overruling of the motion."
Defendant made no request for an admonition by the trial judge to the prospective jurors or for individual voir dire of prospective jurors.
C.Cr.P. 786 provides that the court, the state and the defendant shall have the right to examine prospective jurors and the scope of the examination shall be within the discretion of the court. We have recognized that the purpose of voir dire examination is to determine the qualifications of prospective jurors by testing their competency and their impartiality. State v. Jackson, 358 So.2d 1263 (La.1978); State v. Ford, 349 So.2d 300 (La.1977).
Defendant relies on C.Cr.P. 771 in arguing that the trial court's failure to grant a mistrial or admonish the jury resulted in reversible error. However, the statements of the prospective juror were not of such a nature that they might prejudice the defendant. The remarks reflect a prior knowledge of defendant and his family that might have affected that particular juror's impartiality in the case. The juror's general comments that she knew what had gone on in the past do not necessarily infer that she had knowledge of any particular past crimes. Her statement that she didn't know whether she could be "partial" or fair suggests that she might show a partiality to the defendant. Since the juror's knowledge was not related to the instant case but rather to defendant's personal history, and since the other jurors were not exposed to the factual bases for the juror's possible partiality, it is unlikely that the jurors were prejudiced against the defendant on the basis of the remarks.
In any event the juror's remarks do not fall within the ambit of the mandatory mistrial provisions of C.Cr.P. 770;[6]State *518 v. Cushenberry, 407 So.2d 700 (La.1981). Under C.Cr.P. 771 it is only when an admonition is insufficient to assure a fair trial that a mistrial should be ordered. State v. Baldwin, 388 So.2d 664 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981). The trial court did not abuse its discretion in failing to grant a mistrial.
These assignments lack merit.
Argument No. 3 (Assignment of Error No. 5)
By this assignment defendant contends that the trial court erred in admitting his confession since the state failed to prove the corpus delicti of the offenses charged.
In State v. Mullins, 353 So.2d 243, 246 (La.1977), this court stated: "It is well settled that an accused party cannot be legally convicted on his own uncorroborated confession without proof that a crime has been committed by someone; in other words, without proof of the corpus delicti...." See also State v. Willie, 410 So.2d 1019 (La.1982); State v. Romero, 369 So.2d 1342 (La.1979); State v. Ashley, 354 So.2d 528 (La.1978).
As a general rule extrajudicial confessions, declarations and admissions by the accused are not of themselves sufficient to establish the corpus delicti, but may be considered along with other evidence in determining whether the corpus delicti has been proved beyond a reasonable doubt. As this court observed in State v. Mullins, supra at 246:
"... Although the better practice is to require the establishment of the corpus delicti before an admission or confession is admitted in evidence, the law does not require proof of the corpus delicti as a condition precedent to the introduction of evidence, such as an admission or confession, to connect the accused with the crime charged as long as proof of the corpus delicti is subsequently established during trial. State v. Odom, 247 La. 62, 169 So.2d 909 (1964); State v. Gani, 157 La. 235, 102 So. 319 (1924); State v. Hill, 135 La. 625, 65 So. 763 (1914); State v. Gebbia, 121 La. 1083, 47 So. 32 (1908)...."
Count 1 of the bill of information charged the defendant with simple arson of the Mini-Togs warehouse which occurred on April 19, 1980. Deputy City Fire Marshal James W. Richards testified that the fire occurred at the rear of the building near the alley. He noted that there were rolls of cloth and other materials right inside the door. Edward Hakim, the owner of the building, testified that the back doors were always locked and that there were windows facing the alley between the two doors. Because of the fire damage, there was no way of telling "whether the windows were broken out or not."
Hakim testified that between $700,000 and $800,000 worth of damage was done to his business. He noted that 99% of the material stored in the warehouse was fire retardant and was to be used in the manufacture of children's clothing. Defense counsel inquired of Hakim how this material could burn if set fire to:
"Q. Now, you said that 99 percent or virtually all of this fabric that was being stored in the warehouse was, in fact, fire retardant?
A. Right. Now, fire retardant does not mean that it will not burn. That is not what retardant means. A fire retardant material will burn. It just restricts the flame.

*519 Q. Now, it is my understanding that fire retardant, when you remove the flame, that it will go out.
A. The polyester part will go out. The cotton part will not go out.
Q. Well, if I were to walk to your building right now and take a lighter with me in order to light the corner of one roll
A. Okay. I can probably explain it to you a little bit better. If you took a big piece of material, you could start a fire on one end of it and it would burn the cotton portion of it across the fabric. All right. What is left behind it, the cotton part would burn. What is left behind it, would be the polyester and it will melt but the fire will continuously go across the cotton portion of the goods because in terry, your loop is cotton and your backer, your flat part of your terry is polyester. So the nap will burn but the polyester portion will not burn. It will melt."
This evidence was presented prior to the introduction of defendant's confession. In his confession defendant recalled how he set fire to the building the first time:
"Q: O.K. now ... tell us how you set the fire the first time?
A. The first time ... I walked through the alley and there was a window broke out ... there was a hole in the window... and ... and ... I didn't break into the building ... I went ... I didn't go in the building.....
Q. You never got in the building?
A. No ... cause I didn't have to ... cause the window was broke out and there was a board across there and I just stuck my cigarette lighter in there and set it on fire ...
Medak
Q. Was the window completely broke out or ...
A. No sir ... there was round hole ... like I ... showed you while ago ... Brown
Q. In other words you talking about ... about a 6 or 8 inch hole...?
A. Yea ... well about a 5 inch hole...
Q. But ... it was big enough for you to get your arm through...?
A. My hand through and the cigarette lighter...
Q. O.K. the material was ...
A. The material was right up against the glass and it was so easy to get to ... it ya know.
Q. O.K. and then ... in other words you ... stuck your cigarette lighter through ...
A. And there was a bolt of cloth.
Q. A bolt of ... what you call a bolt of material...
A. Material ... yes.
Q. O.K. and ah ... did you stay around...?
A. No I didn't ... I stuck the match to it ... I mean the lighter to it and I just took my little walk ...
Q. In other words what I'm saying ... is did you make certain that it was caught before you left?
A. I seen it was caught ... when I left.
Q. It was ... burning?
A. It was burning...
Q. And you left?
A. I left..."
The evidence corroborates defendant's confession sufficiently to establish the corpus delicti of simple arson.
Regarding Count 2 of the bill of information, Richards testified that he investigated another fire of suspicious origin on April 27, 1980 which destroyed the same warehouse as the previous fire. Hakim stated that this fire appeared to have originated in the same area as the first fire. After the first fire, the building no longer had doors and had very few windows left and so was easily accessible from the outside.
Defendant confessed that when he set the second fire, he simply walked into the warehouse since the windows and doors were "all knocked away." He stuck his lighter into some old bolts of cloth and they flamed up. Defendant stated that he did not use any lighter fluid or gasoline.
*520 As in Count 1, the evidence and the confession corroborate each other to establish the corpus delicti of simple arson.
Count 3 charged defendant with the aggravated arson of the Amvets Club which occurred on October 28, 1980. This fire was located in the doorway of the building. Richards testified that he detected "a petroleum type odor" at the scene of the fire. He collected some debris that was saturated with the accelerant and submitted it for chemical analysis. The criminalistics report verified that the petroleum product was gasoline.
Defendant, who was at one time a member of Amvets, confessed in detail to obtaining a container of gasoline from a truck parked by a nearby tire company, and then throwing it, and a lighted match, into the Amvets building. At the time of the fire the building was occupied by approximately one hundred persons.
The state provided sufficient corroborating evidence in Count 3 to allow for the admissibility of the confession. The evidence sufficiently establishes the corpus delicti of aggravated arson.
Count 4 charged defendant with simple arson of Star Hardware and Furniture Company on December 24, 1980. The damage to the building amounted to approximately $150,000. The fire was determined to have originated in a wooden structure located at the rear of the store. The owner testified that he stored cardboard boxes in the shed during the Christmas season. This fire was also determined to be of suspicious origin by the Deputy Fire Marshal.
Joe Childers testified that he was with the defendant the night of the fire, and that defendant told him that he was "going to burn the damned thing." Defendant carried two plastic jugs containing a "clear looking liquid" down the alley behind Star Hardware. Childers followed defendant down the alley but left after defendant climbed a ladder to the roof of a building next to Mini-Togs. Shortly thereafter, defendant told Childers that he "burned the damn thing" and they both witnessed the flames from the burning building.
The inculpatory statements of defendant alleged that he set fire to cardboard boxes stacked up in the rear of the building with a cigarette lighter.
The evidence of arson presented by the state at trial provided sufficient corroboration that a crime was committed to allow the admissibility of defendant's statements. Moreover, defendant's statements reveal facts which suggest an intimate knowledge of the origin of the fires.
This assignment lacks merit.
Argument No. 4 (Assignment of Error No. 6)
By this assignment defendant contends that the trial court erred in denying his special requested jury charge and reading a jury charge which failed to comply with C.Cr.P. 804 A(2). Specifically, defendant argues, relying upon State v. Mack, 403 So.2d 8 (La.1981), that the trial court failed to instruct the jury that it should consider the lack of evidence as well as the sufficiency of the evidence in giving the defendant the benefit of every reasonable doubt.
Defendant requested that the trial court read the following charge to the jury:
"The accused is presumed to be innocent until he is proven guilty beyond a reasonable doubt.
The consequence of this rule of law is, he is not required to prove his innocence, but may rest upon the presumption in his favor until it is overthrown by positive, affirmative proof, the burden is upon the State to establish to your satisfaction, and beyond a reasonable doubt, the guilt of the accused, as to the crime charged in the Bill of Information or any lesser one included in it.
If you entertain any reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your sworn duty to give him the benefit of that doubt and return a verdict of acquital (sic). And, even where the evidence demonstrates a probability of guilt, yet, *521 if it does not establish it beyond a reasonable doubt, you must acquit him."
The trial judge denied the request for the jury charge, noting that it was covered by his general charge.
After the trial judge refused to give defendant's requested special charge, the defendant did not object to the judge's general charge on the grounds of noncompliance with C.Cr.P. 804 either before or after the jury was retired. The defendant first raised this issue on appeal. We have held that a defendant may not wait until his appeal before he complains of the trial judge's failure to comply with C.Cr.P. 804. Rather, the defendant must bring the error to the attention of the trial judge at a time when the judge can cure the error. State v. Mack, supra; State v. Lee, 346 So.2d 682, 685 (La.1977). Otherwise, his objection shall be deemed waived.
This assignment lacks merit.
Argument No. 5 (Assignment of Error No. 7)
By this assignment defendant contends that the trial court erred in denying his motion for a new trial since: (1) No evidence, testimonial or physical, was adduced to establish the corpus delicti for the offenses of simple and aggravated arson prior to the introduction of confessions made by defendant; (2) No evidence, testimonial or physical, was adduced to establish that there had been a fire set to a structure belonging to another without his permission independent of defendant's confession; and (3) No evidence, direct or circumstantial, was introduced to prove the existence of the specific criminal intent necessary for conviction.
The first two reasons have already been addressed and resolved in Assignment of Error No. 5. Concerning reason (3), sufficient evidence was introduced to prove the existence of the intent necessary for convictions of aggravated and simple arson. R.S. 14:51 defines aggravated arson as "the intentional damaging by any explosive substance or the setting fire ... whereby it is foreseeable that human life might be endangered." We have interpreted this statute as making punishable "the intentional setting fire to any structure or movable whereby a person of reasonable intelligence and perception would anticipate that human life might be endangered." State v. Baron, 416 So.2d 537, 538 (La. 1982).
Simple arson is defined as "the intentional damaging by any explosive substance or the setting fire to any property of another, without the consent of the owner ..." R.S. 14:52.
In neither of these statutes is there any mention of specific criminal intent; both statutes only refer to "the intentional damaging" or "the setting fire" without any qualifying provisions. According to R.S. 14:11, "in the absence of qualifying provisions, the terms `intent' and `intentional' have reference to `general criminal intent.' "The intent required for a conviction of either aggravated or simple arson as defined by R.S. 14:51 and 14:52 is general criminal intent. See Reporter's Comment, R.S. 14:11.[7]
*522 In State v. Elzie, 343 So.2d 712, 714 (La.1977), this court found that "general intent exists when from the circumstances the prohibited result may reasonably be expected to follow from the offender's voluntary act, irrespective of any subjective desire on his part to have accomplished such result." R.S. 14:10(2).
We find that general criminal intent was present in this case. Both the evidence presented and the confessions indicated that defendant set fire to the structures. For both the crimes of simple and aggravated arson the state was only required to prove beyond a reasonable doubt that defendant either intentionally damaged a structure by an explosive substance or set fire to a structure. In addition, for aggravated arson the state has the burden of showing that it was foreseeable that human life would be endangered, i.e., when from the circumstances the danger to human life may reasonably be expected to follow from the defendant's setting fire to the structure, irrespective of any subjective desire on his part to have accomplished such a result. State v. Elzie, supra. The state met its burden of proof on all four counts.
The trial judge adequately disposed of the defendant's assertions at the hearing on the motion for a new trial held on November 24, 1981. This court recently stated in State v. Molinario, 400 So.2d 596, 599 (La.1981), that "... it is well settled that the decision on a motion for a new trial rests within the sound discretion of the trial judge who is accorded considerable latitude in evaluating the reliability of evidence and its potential impact on the verdict. His ruling will not be disturbed on appeal in the absence of a clear showing of abuse of discretion...." There was no abuse of discretion.
This assignment lacks merit.
For the reasons assigned, the convictions and the sentences are affirmed.
NOTES
[1] On February 19, 1981 the state originally charged defendant with four counts of simple arson under R.S. 14:52. Defendant pleaded not guilty.
[2] "Simple arson is the intentional damaging by any explosive substance or the setting fire to any property of another, without the consent of the owner and except as provided in Section 51 of this Title.

Whoever commits the crime of simple arson, where the damage done amounts to five hundred dollars or more, shall be fined not more than fifteen hundred dollars, and imprisoned at hard labor for not less than two years nor more than fifteen years.
Where the damage is less than five hundred dollars, the offender shall be fined not more than twenty-five hundred dollars or imprisoned for not more than five years, or both." R.S. 14:52.
[3] "Q. All right. Now, when you got there, did you feel that the fire was suspicious or not?

A. Yes, ma'am. I did.
Q. All right. Explain to the jury why.
A. Due to the fact that we didn't find any utilities in that building on or we found no reason for that fire back in the back of that building.
Q. What do you look for? Could you explain to the jury in a little more detail what you look for as far as the natural causes of a fire?
A. Well, we look for machinery or faulty wires or something like that.
Q. Okay. Was there any wiringyou said there were no utilities on. Now, what do you mean?
A. We had no electricity and no gas.
Q. You mean there were none hooked up to the building at all?
A. That is right. It was off.
Q. What about internal combustion type of thing or what about this cloth?
A. I didn't get certification on that. I mean I don't see it would be though.
Q. Okay. So is what you are saying is you didn't find any natural causes for the fire?
A. That is correct. I did not."
[4] The can could not be located at the time of trial.
[5] Sam Messina, the owner of Sam's Bar, testified that defendant had drunk at least six bottles of wine the day he was arrested.
[6] "Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict. An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial." C.Cr.P. 770.
[7] "The definitions of some crimes require a specific criminal intent, while in others no intent is required. Some crimes consist merely of criminal negligence that produces criminal consequences. However, in the absence of qualifying provisions, the terms `intent' and `intentional' have reference to `general criminal intent.'" R.S. 14:11.

"Reporter's Comment
Mental element:
This section amplifies the three preceding sections, and makes it perfectly clear that the required mental element varies with varying crimes. In some crimes, particularly criminal attempts, `specific intent' is required. In still others, such as negligent homicide, only `criminal negligence' is necessary.
The definitions of the great bulk of the crimes in the Code, however, state that there must be an `intentional' production of certain prescribed consequences (for example, `Aggravated arson is the intentional damaging * * * or setting fire to any structure * * *'). However, in some crimes the production of certain consequences plus a specific intent to produce or accomplish some prescribed consequences is necessary (for example, `Forgery is the false making or altering, with intent to defraud, of any signature * * *'). Such an intent is a `specific intent.' The concluding sentence of this section indicates that when the term `intentional' or `intent' is used alone without modification, it refers to `general criminal intent' as defined in the preceding section." (Emphasis added).