# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-816

STATE OF LOUISIANA

VERSUS

JACOB DEWAYNE PURVIS

**********

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 15-930
HONORABLE WARREN D. WILLETT, DISTRICT JUDGE

**********

## PHYLLIS M. KEATY
## JUDGE

**********

Court composed of John D. Saunders, Phyllis M. Keaty, and John E. Conery, Judges.

**AFFIRMED.**

Chad M. Ikerd
Louisiana Appellate Project
Post Office Box 2125
Lafayette, Louisiana 70502
(225) 806-2930
Counsel for Defendant/Appellant:
    Jacob Dewayne Purvis

**James P. Lemoine**
**District Attorney**
**Rhea Renee Nugent**
**Jimmy White**
**Assistant District Attorneys**
**Post Office Box 309**
**Colfax, Louisiana  71417-0309**
**(318) 627-3205**
**Counsel for Appellee:**
**State of Louisiana**

**KEATY, Judge.**

Defendant, Jacob Dewayne Purvis, appeals his conviction and sentence for aggravated arson. For the following reasons, we affirm the trial court.

**FACTS AND PROCEDURAL BACKGROUND**

Defendant lived in a double-wide trailer with his mother, uncle, sister, and his sister's two daughters. During the morning of September 16, 2015, Defendant and his sister were arguing inside the trailer when he allegedly threatened to burn it down. He exited the trailer, threw a bug zapper against the wall on the front porch, and walked to the side of the house. A few minutes later, the trailer caught on fire and ended in a total loss. The occupants inside the trailer at the time, Defendant's sister, one of her daughters, and his uncle, exited before it burned down. Defendant's sister and her daughter received injuries from being burned as they exited the trailer. Defendant contends that he did not intentionally set the fire and points to the bug zapper as a possible cause. Defendant insists he was joking regarding his comments about burning the trailer down.

On October 16, 2015, Defendant was charged with aggravated arson, in violation of La.R.S. 14:51, and subsequently pled not guilty. Following a three-day jury trial which began on June 20, 2016, Defendant was found guilty and thereafter sentenced to twelve years at hard labor, with the first two years to be served without benefit of probation, parole, or suspension of sentence, to run consecutively with any other sentence. Defendant was also ordered to pay a $5,000.00 fine, court costs, and a $1,000.00 fee to the Public Defender's Office.

Defendant appealed, which was granted by the trial court on July 25, 2016. On July 29, 2016, he filed with the trial court a pro se "Method of Appeal/Out of time Appeal Pursuant to L.S.A.-924-930." Therein, he asked to appeal his

conviction and requested the trial court reconsider his sentence "to be tried again[.]" It was denied by the trial court for the reasons that it had already granted an appeal and that Defendant had not yet been sentenced. He was sentenced on August 11, 2016, and a third motion for appeal was filed that same day.

Defendant is now before this court asserting two assignments of error: (1) "The State failed to sufficiently prove Jacob Purvis acted intentionally to set the fire that destroyed his home, rather than the fire being a result of an accident" and (2) "The twelve-year sentence by the judge in this case is constitutionally excessive."

## DISCUSSION

### I. Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

### II. First Assignment of Error

In his first assignment of error, Defendant contends the State failed to sufficiently prove that he acted intentionally when setting the fire that destroyed his home rather than it resulting from an accident. When the sufficiency of evidence claim is raised on appeal, this court in *State v. Shaikh*, 15-687, pp. 3-4 (La.App. 3 Cir. 3/23/16), 188 So.3d 409, 413-14, discussed the following inquiry to be used by the reviewing court:

> [W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982);

2

> *State v. Moody*, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Thacker*, 13-516, p. 5 (La.App. 3 Cir. 1/28/15), 157 So.3d 798, 804 (quoting *State v. Freeman*, 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580).

In. *State v. Baumberger*, 15-1056, pp. 10-11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826-27, we held:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

"Aggravated arson is the intentional damaging by any explosive substance or the setting fire to any structure . . . whereby it is foreseeable that human life might be endangered." La.R.S. 14:51(A). The intent required for a conviction of aggravated arson is general criminal intent. *State v. Simmons*, 443 So.2d 512 (La.1983). "General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences

as reasonably certain to result from his act or failure to act." La.R.S. 14:10(2). The State, therefore, was required to prove that Defendant set fire to the trailer and that it was foreseeable that human life may be endangered, i.e., "when from the circumstances the danger to human life may reasonably be expected to follow from the defendant's setting fire to the structure, irrespective of any subjective desire on his part to have accomplished such a result." *Simmons*, 443 So.2d at 522.

Deputy Thomas Vice of the Grant Parish Sheriff's Office (GPSO) testified at trial on behalf of the State. Deputy Vice was dispatched to the trailer fire on the day in question; however, it had been cleared by first responders by the time he arrived. Deputy Vice spoke to Defendant's sister, Laicon Purvis, who advised that she and Defendant had been arguing that morning inside the trailer.[1] She told Deputy Vice that as Defendant walked outside, he said something about burning the place down. Laicon informed Deputy Vice that the fire occurred a few minutes after Defendant went outside. Deputy Vice testified that Laicon said Defendant went back inside the trailer to alert them of the fire. Laicon told Deputy Vice that she grabbed her two-year-old daughter and ran out the front door. She informed Deputy Vice that as she crossed the burning porch, she and her daughter were burned. Deputy Vice testified that Laicon's daughter sustained burns on her back, and Laicon sustained a burn on her arm.

Deputy Vice thereafter spoke to Defendant, who was sitting in a chair, crying hysterically and throwing himself around. Deputy Vice stated that Defendant corroborated Laicon's story that they had been fighting and that he had angrily gone outside. According to Deputy Vice, Defendant advised that he was on the phone with his mother and smoking a cigarette with his back to the trailer

---

[1] Laicon was not called to testify at trial.

4

when he turned around and saw the porch on fire. According to the testimony, Defendant informed Deputy Vice that he "did not say that I was going to burn the house down, I said that I ought to burn the house down." Deputy Vice said that as the fire was burning, there were small explosions caused by hot propane tanks located in and around the property. According to Deputy Vice's testimony, there was concern that a large propane tank located behind the house would also explode.

Deputy Kevin Billiott, who was employed by the Louisiana State Fire Marshal, testified on behalf of the State. Deputy Billiott accompanied the lead investigator, Deputy Allen Jones, to the trailer fire. Deputy Billiott advised that upon arrival, the fire department was struggling to extinguish the fire. Deputy Billiott subsequently interviewed Laicon at the hospital and testified that her injuries were superficial, resulting in her refusing treatment. However, Deputy Billiott testified that Laicon's daughter suffered first-degree burns on her back. According to Deputy Billiott's testimony, Laicon revealed that Defendant became angry on the morning in question when he was accidentally awoken. Laicon told Deputy Billiott that she and Defendant began arguing when the topic changed from being awakened to the trailer's condition. According to Deputy Billiott's testimony, Laicon advised that Defendant was upset and blamed them for hoarding things in and around the trailer. He testified that Laicon said Defendant threatened to burn the trailer down because he "wanted the house to be like their other house[,]" which Deputy Billiott later learned had also burned down. Deputy Billiott stated Laicon revealed that Defendant made at least two similar threats in the past when he was "high on meth and he was coming down really hard[.]" Deputy Billiott testified that Laicon indicated that, in the instant case, Defendant was more upset and violent than when he made the previous threats and that she

5

believed the fire started on the porch by the front door. He testified that Laicon said that Defendant was a liar who would have used a lighter to start the fire as they both smoked. Deputy Billiott revealed that Laicon "was convinced that while [Defendant] was outside[,] he started the fire." On cross-examination, Deputy Billiott was read Laicon's recorded statement wherein she said: "*I don't know if he done it . . . but my heart says he did*." Deputy Billiott thereafter responded "Okay" when opposing counsel asked, "in this statement she is admitting she doesn't know . . . whether or not [Defendant] started the fire[.]"

Jody Bullock, who was employed by the Grant Parish Detention Facility and formerly employed by the GPSO as the Chief of Detectives on the date in question, testified for the State that prior to the fire, he knew Defendant and Laicon. Bullock revealed that upon arrival, Laicon advised that she and Defendant had been arguing that morning when "he screamed I hope this M F- - -er burns, and left the residence." Laicon revealed to Bullock that approximately ten minutes later, Defendant yelled that the house was on fire, and she grabbed her baby and ran out the front door. On cross-examination, Bullock noted that Laicon was "not [the] . . . best person to get information from" as she previously gave him information that was not credible. Bullock stated, however, that he believed Laicon with respect to the present matter.

Bullock testified that Darrell Smith, Defendant and Laicon's uncle, was inside the trailer when the fire started. According to Bullock, Smith advised that Defendant and Laicon were fighting when Defendant became upset and exited the front door. Bullock testified that Smith said that "he heard [Defendant] say, I am going to catch it on fire, referring to the house." Bullock revealed Smith noted that

6

"not long after that he heard Defendant yelling fire. . . . he saw the front of the house on fire. And he left the residence."

Bullock located Defendant in the back of Deputy Vice's patrol car where he read Defendant his rights. Bullock said Defendant was upset and denied using methamphetamine. Bullock testified that Defendant said "he did not really know what happened, the house just caught on fire." Bullock asked Defendant whether he had previously threatened to burn the trailer, and Defendant responded that "he was always making statements like that about this burning or that burning or something like that." Defendant was thereafter transferred to the sheriff's office.

Bullock testified that at the sheriff's office, Defendant informed him that Laicon's daughter had a doctor's appointment that morning, and she would not get out of bed, so they got into an argument. Defendant told Bullock that "he might have said something to the effect, this house ought to burn down but that he didn't mean it." When Bullock asked how the fire might have started, Defendant responded that following the argument, he went outside on the front porch where he grabbed and threw a bug zapper against the wall, but he was unable to remember whether it was plugged in. Defendant told Bullock he exited the porch and went "to the side [of] the house for about ten (10) minutes . . . to smoke a cigarette and . . . he might have called somebody[.]" According to Bullock's testimony, Defendant indicated that when he returned, the house was on fire, and he started yelling. Bullock stated that Defendant failed to mention the bug zapper incident during his initial interview in the police car. On cross-examination, Bullock agreed that Defendant never confessed to intentionally starting the fire. Bullock testified that Defendant "indicated that he did not know how it started[,]" although he offered the bug zapper theory as a possible explanation.

7

Deputy State Fire Marshal Allen Jones, another State witness, was accepted by the trial court as an expert in fire inspection and arson investigation. Deputy Jones said that when he arrived at the trailer around 1:30 p.m., it had been on fire for over an hour, and a majority of the structure was down. Deputy Jones noted the conditions of the trailer were perfect for a fire and that no smoke detectors were located in the structural remains. Deputy Jones spoke with Smith, the only resident present at the time he arrived, who informed him that Defendant and Laicon had been arguing that morning. Smith indicated that before Defendant exited the residence, he heard him say that he was going to take gas and set the house on fire. Smith also stated there was no gas on the property. Deputy Jones said they had a vehicle located on the property. He testified that Smith said that after Defendant went outside, he heard someone yell something about a fire. Smith indicated that he then went into the living room where he saw fire coming inside from the porch. According to Deputy Jones' testimony, Smith ran out the front door and through the fire but was not injured. Deputy Jones testified that Smith said Defendant ran through the fire to warn them, and he attempted to extinguish the fire with a water hose. Deputy Jones testified that Smith told him that he had previously heard Defendant make similar statements to Laicon during their arguments. Smith was unable to explain to Deputy Jones why the family failed to run out the back door during the fire.

Deputy Jones proceeded to the Grant Parish Detention Center where he spoke with Defendant, who was concerned about his family's wellbeing. Defendant told Deputy Jones that the residence was full of junk. According to Deputy Jones, Defendant "stated that he . . . did not say that he wanted to set the house on fire, he stated that he wanted the house to be like their previous house."

8

Defendant explained to Deputy Jones that their previous house was in the same condition as this trailer. He indicated to Deputy Jones that the previous house burned down, and "they had the chance to start over." Defendant agreed that he was mad at Laicon on the morning in question, according to Deputy Jones. He further testified that Defendant said, "I did not say I wanted the house to burn, I said . . . I wanted it to be like the other house." Deputy Jones advised that Defendant admitted he smoked cigarettes; however, "he didn't have any at the time." According to Deputy Jones, Defendant "stated he did not know what the [fire's] origin was" and "couldn't . . . imagine what it could be." Deputy Jones testified Defendant advised that he was sitting in a chair outside facing the road with is back to the trailer talking to his mother on the phone when he noticed the fire. Deputy Jones testified Defendant said that he got off the phone, ran through the fire and the front door, and alerted everyone.

Deputy Jones testified Defendant "stated the only thing that he thought that could have started the fire was a bug zapper." Defendant told Deputy Jones that the bug zapper had been plugged in and was working the night before; however, he was uncertain whether it was on when he threw it. Defendant informed Deputy Jones that it was plugged into a ground fault outlet or a fault interrupter outlet. Deputy Jones testified the bug zapper was plugged into a surge protector which was plugged into a ground fault outlet. Deputy Jones noted if there was an overcurrent of any kind, the ground fault outlet and the surge protector would be tripped which would have stopped electricity from going through the outlet.

Deputy Jones investigated the fire and stated there was not much of the trailer left as the fire had engulfed the entire structure. He was not able to use burn patterns because of the severity of the fire but determined the fire started on the

front porch based on the corroborating statements of witnesses and first responders. Deputy Jones testified there was no inclement weather on the day in question that would have produced lightning. Deputy Jones also ruled out the bug zapper theory as the fire's origin given his knowledge of the devices by stating: "[T]hey are not designed to produce heat. They . . . are designed to electrocute small bugs. That is an electrocution thing, it is not a heat thing." Deputy Jones determined the fire was intentionally set. However, he was not able to determine the cause of the fire because "there was very little physical evidence remaining . . . on the property[.]" Deputy Jones testified that after excluding every other reasonable hypothesis, he obtained a warrant for Defendant's arrest for aggravated arson. On cross-examination, Deputy Jones testified that Defendant said there was no gas on the property.

The State's final witness was Smith, Laicon and Defendant's uncle. Smith testified that Laicon and Defendant had been arguing when Defendant told him that he was going to burn the house down with gasoline. Smith said the house was on fire approximately five minutes later. On cross-examination, he said there was no gasoline on the property. Smith testified that he heard Defendant make similar statements in the past about burning the house down "because there [was] a bunch of junk on the front porch[,] and he [was] just tired of it." Smith advised that Defendant often threatened to burn the house during his arguments with Laicon. Smith said on the day at issue, Defendant did not say anything different than what he usually said. Smith testified he never felt Defendant was serious until that day.

Smith stated he did not see Defendant in the trailer after the fire started. He advised that Laicon alerted him of the fire at which point everyone exited through the front door. Smith stated the trailer had a back door that stayed locked with a

chain lock, but it was blocked by "junk." Smith testified the fire was burning on the front porch and into the house through the front door. He advised that he was unable to run out the front door without being burned. Smith testified that once outside, he saw Defendant attempting to extinguish the fire with a water hose. Based on Defendant's demeanor that day, Smith felt Defendant had burned the house. Smith admitted on cross-examination that he did not know what actually caused the fire. When asked about the bug zapper, Smith recalled that it was working, but he could not recall whether it was plugged in that day.

Shenan Purvis was a witness at trial for the defense. Shenan said she was Defendant's mother and had prior convictions for perjury on a restraining order and possession with intent. Shenan admitted she was a hoarder. She testified that on the day of the fire, she was on the phone with Defendant, who had been arguing with Laicon. Shenan said Defendant was angry; however, she did not hear him threaten to burn the trailer down. Shenan testified that Defendant told her he exited the house to cool off, and, while on the phone, he discovered the house was on fire. Shenan said she told Defendant to get the water hose and extinguish the fire. She testified that Defendant never told her he was smoking a cigarette.

Thomas McLaughlin, also a witness for the defense, testified that he was Defendant's neighbor and that he was in bed when his girlfriend began to scream. McLaughlin advised he went outside and saw Defendant "spraying that trailer" and the front porch in an attempt to extinguish a fire; however, it "wasn't doing to[o] much good." McLaughlin said there was too much stuff piled up under the porch, and Defendant seemed upset at that time.

Nelda Delrie, McLaughlin's girlfriend, also testified on behalf of Defendant. She stated that she walked outside and saw black smoke coming from the front of

11

Defendant's house.  Delrie opined that Defendant looked distraught as he sprayed the front porch with a water hose.  She did not see how the fire started, and she never saw Defendant run inside the house.

Sergeant Lehoma Couch also testified at trial on Defendant's behalf.  Her job was to oversee inmates at the Grant Parish Detention Center.  Sergeant Couch said that on the day after the fire, Defendant was given a urine drug screen.  She said the results were negative for amphetamines, cocaine, marijuana, methamphetamine, and opiates.

Defendant testified at trial and stated that he was unemployed at the time of the fire.  Defendant admitted that he had been arrested several times and had two convictions, i.e., creation and operation of a clandestine methamphetamine laboratory and manufacturing methamphetamine.  Defendant said the operation of the methamphetamine lab never caused a fire.  Defendant was asked if he was using methamphetamine, and he responded, "[y]es ma'am."[2]  Defendant said his mother, sister, two nieces, and uncle lived with him in the trailer.  He stated the family's prior home, which he sometimes refers to as the log house in his testimony, burned in 2008 or 2009, but he was incarcerated at the time.  Defendant testified that on the day of the fire, he tried to get Laicon out of bed so they could bring her daughter to the doctor.  When Laicon finally got up, Defendant said they were mad at each other and began arguing.  Defendant stated, "I walked outside and - - you have a walkway, you have a pile of stuff all the way . . . to the ceiling almost on one side and all the way to the ceiling on the other way is a pathway that walks down to the yard."  He said there were extension cords lying around and a

_____

[2] Defendant was not asked when he was using methamphetamine.  It is unclear from the question whether it was at the time of his prior convictions or at the time of the fire.

bug zapper that was hanging "right in [his] face." He described it as a "rats nest of wiring[.]" Defendant said he did not want to hit his head, so he ripped down the bug zapper wiring and "slung it against the wall . . . on top of all the garbage junk that was on top - - was on my porch."

Defendant testified that he sat in a chair under trees talking to his mother on the phone, but he could not see the front porch as he was facing the road. After their conversation ended, he went back to the trailer and heard a crackling sound. Defendant stated that as he walked in front of his camper,[3] he saw black smoke, and his first "instinct was, oh my God, everybody is inside." Defendant indicated that his mother called him back, and he responded he could not talk because he had the water hose in his hand. Defendant testified the porch overhang, which was fiberglass, was on fire and "it just started dripping everywhere causing fire everywhere." Defendant wanted to extinguish the fire, but the fire extinguisher he retrieved from his camper was empty. He testified that he then ran through the fire and had to bust through the front door of the trailer to get inside. Defendant stated that the fire was going into the house, that he yelled there was a fire, and told everyone to go out the back door. Defendant indicated there was a clothes hamper in front of the back door, which was closed and locked with a deadbolt. Defendant testified he did not unlock the back door; rather, he knocked it down and thought the others were following him; however, they exited the front door. Defendant testified that once outside, he ran to the front of the trailer and retrieved the water hose, although it was too short to reach the front porch. He stated he then began to water down his cargo trailer and camper. Defendant indicated that by the time he

---

[3] Defendant testified that in front of his trailer sits a cargo trailer, a camper trailer, and two oak trees.

made it to the front porch, Laicon, his niece, and Smith were at the neighbor's house. According to his testimony, Defendant revealed he fought the fire for approximately fifteen minutes, and his neighbors had to drag him away.

Defendant testified that he never really said or meant he was going to burn the trailer down. Rather, Defendant indicated that he had piles of trash in and around his house that he wanted gone and the only way to dispose of the trash was "a burn pile." Defendant revealed that he would "tell everybody . . . it is time to start a fire, meaning . . . lets [sic] start a fire in that burn pile and start throwing stuff . . . on the burn pile." Defendant admitted he told Deputy Jones that "one thing lead to another" and "everything needs to be started over again, it needs to be done like the log house, just burnt down, wiped clean and simple." Defendant testified he did not mean he wanted his house to burn down. He said, "there was a[n] ongoing joke with mom and me and that was the burning pile in the back yard[; it] was my little way of getting rid of everything that my mom brought home." According to Defendant, the joke between them was, "when are you going to leave so I . . . can get a chance to . . . heat something up." He recalled stating under his breath during a conversation with the Fire Marshal that he did not want the house to burn, but he wanted the stuff gone.

Defendant testified that he did not know what caused the fire, and he did not intentionally set the fire. He said Deputy Vice's statement that Defendant said he was smoking was incorrect because he was out of cigarettes that day. Defendant testified there were thousands of dollars' worth of paint cans, aerosol cans, and hairspray cans outside the trailer. Defendant further testified that one vehicle maintained by their family probably contained enough gas to get to Pollock.

14

In his appellate brief, Defendant argues there was insufficient evidence to convict him of aggravated arson because no rational jury could have found that the State proved he intentionally set fire to his trailer. Defendant contends that Deputy Jones guessed about what happened without examining the physical evidence, and his conclusions were based on interviews with witnesses who did not see how the fire was started. Defendant asserts that Deputy Jones failed to consider other accidental possibilities, such as a short in the wiring on the front porch. Defendant points out that Deputy Jones ruled out the bug zapper as the cause of the fire based on his knowledge that bug zappers do not produce heat, but failed to offer any testimony indicating that tests were actually performed in order to determine whether the bug zapper caused the fire.

At the outset, we agree that some of Deputy Jones' conclusions about the cause of the fire were based upon statements from witnesses and Defendant. There were no objections, however, to Deputy Jones' testimony or his reliance on the statements. Additionally, there were no objections to Deputy Jones' testimony regarding his knowledge of bug zappers. Accordingly, any claims regarding these issues were waived. La.Code Crim.P. art. 841.

We also look to *State v. Lindsey*, 46,313, p. 9 (La.App. 2 Cir. 5/18/11), 69 So.3d 566, 571, where the defendant burned his girlfriend's apartment and was convicted of aggravated arson. On appeal, he alleged the state failed to prove a corpus delicti. *Id.* The corpus delicti rule provides that a person cannot be convicted solely on his confession. *Id.* There must "be some evidence, besides the confession, that a criminal act was committed by someone." *Id.* at 571. The defendant claimed the state failed to prove the fire was the result of a criminal act, i.e., that it was deliberately set or was not of accidental origin, since the fire

15

marshal found no evidence of the use of accelerants and no witnesses saw the defendant set the fire. *Id.*

The second circuit affirmed the conviction and stated the "evidence of [the defendant's] criminal act was both direct and circumstantial, and **the absence of forensic proof of arson is not fatal to the case against him**." *Id.* at 571 (emphasis added). It noted that even though the fire marshal found no evidence of the use of accelerants, the evidence showed that prior to the fire, the defendant had placed a call to the victim from inside her apartment saying, "I told you I'd get even with you[.]" *Id.* The evidence revealed that the defendant visited a convenience store before the fire and told the cashier that he was going to burn the victim's apartment down. *Id.* The evidence indicated that the defendant had the opportunity to enter the apartment and start the fire, and he later confessed to his aunt that he started the fire. *Id.*

In *State v. Duperon*, 12-810 (La.App. 1 Cir. 12/21/12) (unpublished opinion), the defendant was convicted of aggravated arson.[4] On appeal, he argued his statements to police alone could not establish his culpability, and there was no other evidence linking him to the fire to show it was intentionally set. *Id.* In affirming the defendant's conviction, the first circuit responded:

> We agree with defendant's contention that he could not be convicted on his own uncorroborated confession without proof that a crime has been committed by someone. *See State v. Celestine*, 452 So.2d 676, 678 (La.1984). However, under the circumstances of this case, we doubt that defendant's statements to Detective Brown should in any sense be considered a "confession." Defendant's statements amounted to his story that he went to the residence looking for a friend who owed him money, his stating that he possessed gas because he performed weed eating services for people, and his claims that the burn marks on his hands were old scars and not recent injuries. On their face, these statements do not rise to the level of an

---

[4] *Duperon* can be found at 2012 WL 6681847.

"uncorroborated confession" because defendant never admits any responsibility for the offense. If these statements had been the only evidence of defendant's guilt offered at trial, any rational jury should have found the defendant not guilty.

*Id.* at p. 4.

The defendant in *Duperon* argued the state failed to prove that any criminal act occurred. Addressing this issue, the first circuit responded:

> In the instant case, [the arson investigation expert] testified that the fire . . . was intentionally set, as opposed to an accidental or spontaneous fire. [The expert] also indicated that the fire had only been burning for a short period of time and that it could have been ignited with only a lighter. This uncontroverted testimony was itself sufficient to allow the jury to conclude that the fire occurred as a result of someone's criminal act. Lieutenant Dupuy's observation of defendant pulling out of the residence's driveway, as well as defendant's own statements to Detective Brown, were sufficient to allow the jury to conclude based on circumstantial evidence that defendant was present at the residence when the fire started. Finally, considering that defendant's clothing smelled like smoke and that his fingertips appeared to be burned, the jury did not act irrationally in concluding that defendant actually set fire to the residence. . . .
>
> Viewed in the light most favorable to the prosecution, the evidence was sufficient to support a finding that defendant was guilty of aggravated arson.

*Id.* at pp. 4-5.

In *State v. Theriot*, 93-1959 (La.App. 1 Cir. 12/2/94), 648 So.2d 1042, *writ denied*, 95-205 (La. 6/25/95), 654 So.2d 1103, the defendant was convicted of simple arson. On appeal, he alleged the state failed to meet its burden of proof because no one saw him burn down the trailer. *Id.* In affirming his conviction, the first circuit noted the testimony of the victim's neighbor that she saw the defendant running in the back of the trailers after the trailer home was set on fire and that the defendant later stared at the witness and told her he would burn her trailer also. *Id.* The first circuit also pointed to witness testimony that there was history of trouble

17

between the defendant and the boyfriend of the victim whose trailer was burned and that the defendant had stated he had set the fire. *Id.*

The instant matter is similar to *Duperon* in that Defendant herein was convicted based on statements made prior to the fire and to police despite his failure to confess to starting the trailer fire. As noted in *Lindsey*, 69 So.3d 566, the lack of forensic proof of arson is not fatal to the case against Defendant herein. This case is also similar to *Theriot* in that no one actually saw Defendant set fire to the trailer.

At trial, the State established the occurrence of a criminal act through Deputy Jones' testimony that the fire was intentionally set. Although he was unable to determine the cause of the fire, Deputy Jones ruled out gasoline, weather, and the bug zapper as other possible causes. The evidence and testimony further revealed that Defendant was present at the trailer before, during, and after the fire. The record contains testimony from multiple witnesses that Defendant threatened to burn the trailer. Defendant did not deny saying he threatened to burn it; rather, he said any alleged threat was merely a joke.

The foregoing evidence and testimony was sufficient to allow the jury to conclude the fire occurred as a result of someone's criminal act. We find the State proved the elements of the offense beyond a reasonable doubt. Accordingly, the jury did not act irrationally in concluding Defendant set fire to the trailer, and Defendant's conviction is affirmed.

## III. Second Assignment of Error

In his second assignment of error, Defendant contends the twelve-year sentence imposed in this case is constitutionally excessive.

At the sentencing hearing, the trial court noted that Defendant had waived a pre-sentence investigation report. The trial court pointed to Defendant's two previous convictions for operation of a clandestine laboratory where he was sentenced to seven years at hard labor for each offense. The trial court stated it had little information regarding Defendant other than he maintained his innocence and that he was twenty-seven years old. The trial court then discussed the aggravated arson charge as follows:

> Both your sister and your uncle testified, they were living in the home on the day of the fire, they believed that you set the fire. At the trial, they still believed that you set the fire. So, sir, the people that know you probably as well as anyone, they believed you set the fire, the jury believed that you set the fire.
>
> . . . .
>
> According to the testimony that was presented that was a serious fire. The neighbors testified they . . . were unable to approach the fire due to the heat. The fire marshal - - the responders testified that they were unable to completely approach and extinguish the fire due to the heat and the explosions from the numerous propane tanks that were exploding during the fire. That was a very dangerous situation. The sister and the young baby both received burns trying to escape the fire.
>
> Aggravated Arson carries a very serious . . . penalty because of the danger that can occur to the people in the house, the people around the house and there are people that are required to respond to that incident.

The trial court imposed a sentence of twelve years at hard labor, with the first two years to be served without benefit of probation, parole, or suspension of sentence, and ordered Defendant to pay a fine of $5,000.00, court costs, and $1,000.00 to the Public Defender's Office. The sentence was ordered to run consecutively to any other sentence Defendant was serving.

There was no objection to the sentence imposed, and no motion to reconsider sentence was filed after the sentence was imposed. The mechanism for

preserving the review of a sentence on appeal is found in La.Code Crim.P. art. 881.1, which provides

> A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
>
> . . . .
>
> E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

Because Defendant failed to object to the sentence or properly file a motion to reconsider, we find that he waived his right to appeal the excessiveness of his sentence under La.Code Crim.P. art. 881.1. *See State v. Bamburg*, 00-675 (La.App. 3 Cir. 11/2/00), 772 So.2d 356.

This court, however, has previously reviewed claims of excessiveness where no objection was made and no motion to reconsider sentence filed. *See State v. Davis*, 06-922 (La.App. 3 Cir. 12/29/06), 947 So.2d 201. Accordingly, we will review Defendant's claim as a bare claim of excessiveness.

Louisiana courts have laid out the following guidelines with regard to excessive sentence review:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:
>
> > [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to

shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir. 1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958.

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

Defendant was convicted of aggravated arson, which is punishable by imprisonment at hard labor for not less than six nor more than twenty years and a fine of not more than $25,000.00. La.R.S. 14:51(B). Two years of the sentence shall be served without benefit of probation, parole, or suspension of sentence. *Id.*

21

Defendant was sentenced to twelve years at hard labor with two years of the sentence to be served without benefits.

Aggravated arson is a serious offense, as it requires the foreseeability that human life might be endangered. In this case, there were three occupants of the home when the fire was set, including a two-year-old child who suffered first-degree burns. As for Defendant, he was twenty-seven years old at the time of sentencing and had two prior felony convictions.

In *State v. Qutoum*, 02-780 (La.App. 5 Cir. 1/28/03), 839 So.2d 323, *writ denied*, 03-595 (La. 5/30/03), 845 So.2d 1059, the fifth circuit found that a sentence of ten years was not excessive for a conviction of aggravated arson wherein the defendant was a first offender who set fire to a building that he owned which contained a grocery store on the first floor and an apartment on the second floor. At the time of the fire, the defendant knew the mother and children residing in the apartment were home and that one of the children suffered from a respiratory condition. *Id*. "Defendant created a risk of death or great bodily harm to the family who lived in the apartment above the grocery store and to everyone who lived in the area of the building for financial gain." *Id*. at 333.

Based on the Defendant's criminal history, the nature of the offense, and the penalty imposed in the case cited herein, we cannot say the trial court abused its discretion in sentencing Defendant to serve twelve years at hard labor.

**DECREE**

We affirm Defendant's conviction and sentence in this matter.

**AFFIRMED.**

22