# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-521

STATE OF LOUISIANA

VERSUS

KATRON V. RICHARD

A/K/A KATRON RICHARD

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 16-CR-1007
HONORABLE KEITH RAYNE JULES COMEAUX, DISTRICT JUDGE

**********

## ELIZABETH A. PICKETT
## JUDGE

**********

Court composed of Elizabeth A. Pickett, John E. Conery, and Candyce G. Perret, Judges.


## AFFIRMED; REMANDED WITH INSTRUCTIONS.


**Holli Ann Herrle-Castillo**
**Louisiana Appellate Project**
**P.O. Box 2333**
**Marrero, LA 70073**
**(504) 345-2801**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    Katron V. Richard

**M. Bofill Duhé**
**District Attorney, Sixteenth Judicial District**
**W. Claire Howington**
**Assistant District Attorney**
**300 Iberia St., Suite 200**
**New Iberia, LA 70560**
**(337) 369-4420**
**COUNSEL FOR STATE-APPELLEE:**
     **State of Louisiana**

**PICKETT, Judge.**

## FACTS

On June 19, 2016, Mar'Quise Colbert was living with his aunt, Charlene Johnlouis, at her residence at 415 Hubertville Road, Jeanerette, Louisiana. Ms. Johnlouis was renting the house, which was owned by Randy Babineaux. His aunt awakened him by phone that morning and asked him to open the door for her because Katron Richard, the defendant, was outside the house and she was afraid to come in by herself. Mr. Colbert did so, and saw the defendant walking away from the house. Ms. Johnlouis changed clothes to go to work, and Mr. Colbert walked her to her car. Mr. Colbert then went back to sleep.

About an hour later he woke up coughing and realized the house was on fire. Mr. Colbert ran out of the house and called his mother, then Ms. Johnlouis, and then 9-1-1.

The house and contents were extensively damaged by the fire. An investigation into the cause and origin of the fire was conducted. The fire marshal who conducted the investigation determined it was incendiary in nature. In the course of the investigation, footage was retrieved from the security camera of a neighborhood home which showed a man walking both to and from the area behind Ms. Johnlouis's house immediately before the fire was discovered. Fire Chief Clarence Clark reviewed the footage and identified the man as his second cousin, Katron Richard, the defendant herein. Mr. Colbert also identified the man on the security camera footage as the defendant. Chief Clark contacted the defendant and asked him to come in and give a statement. The defendant agreed to come in for an interview but failed to appear. Ultimately, a warrant was issued for his arrest.

The defendant was charged by bill of information filed on August 25, 2016, and amended bill of information filed on October 11, 2017, with aggravated arson, a violation of La.R.S. 14:51. Trial by jury commenced on October 16, 2017. The defendant was found guilty of the responsive verdict of simple arson over $500.00, a violation of La.R.S. 14:52, on October 18, 2017. On January 12, 2018, the defendant was sentenced to serve eight years at hard labor and ordered to pay restitution in the amount of $33,617.98 to Mr. Babineaux and $10,000.00 to Ms. Johnlouis.[1,2] A Motion to Reconsider Sentence was filed on January 30, 2018 and denied without a hearing the following day. A Motion for Appeal and Designation of Record was filed on February 26, 2018 and was subsequently granted.

## ASSIGNMENTS OF ERROR

The defendant asserts two assignments of error:

1. The evidence was insufficient to uphold the conviction.

2. The sentence imposed was excessive.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent.

Trial court gave the defendant insufficient advice as to the time period for filing post-conviction relief. The trial court advised the defendant as follows:

> Mr. Richard, you have two years within which to file for post-conviction relief. If you think a state or federal constitutional right has been violated, you have two years to complain about it. Failure to

---

[1]At the sentencing hearing, the trial court stated the monetary amounts were ordered as a civil money judgment. However, a restitution order was signed by the court that day.

[2]Ms. Johnlouis's last name is spelled Johnlouis in the bill of information and on her time card admitted into evidence as State's Exhibit 9. However, it is spelled Jeanlouis in the trial transcript. We will use the spelling found on the bill of information and time card throughout this opinion.

2

complain about it within two years means you lose the right to complain about it.

According to La.Code Crim.P. art. 930.8, the two-year prescriptive period for filing post-conviction relief begins to run *after the conviction and sentence become final* under the provisions of La.Code Crim.P. arts. 914 or 922. Thus, the trial court's advice was insufficient in that it failed to inform the defendant that the two-year time period will begin to run after the defendant's conviction and sentence become final. The trial court is directed to inform the defendant of the correct provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record of the proceedings that the defendant received the notice. *See State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

**ASSIGNMENT OF ERROR NUMBER ONE**

In his first assignment of error, the defendant contends the evidence is insufficient to uphold his conviction for simple arson.

> In *State v. Bryant*, 12–233 (La.10/16/12), 101 So.3d 429, the Louisiana supreme court addressed the sufficiency of the evidence claims, reiterating that the appellate review of such claims is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See State v. Captville*, 448 So.2d 676 (La.1984). In applying the *Jackson v. Virginia* standard, the appellate court must determine that, when viewed in the light most favorable to the prosecution, the evidence is "sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *Bryant*, 101 So.3d at 432. See also La.Code Crim.P. art. 821.

> In *State v. Spears*, 05–964, p. 3 (La.4/4/06), 929 So.2d 1219, 1222–23, the supreme court stated that:

>> constitutional law does not require the reviewing court to determine whether it believes the witnesses or whether it believes that the evidence establishes guilt beyond a reasonable doubt. *State v. Mussall*, 523 So.2d 1305, 1309

3

(La.1988). Rather, the fact finder is given much discretion in determinations of credibility and evidence, and the reviewing court will only impinge on this discretion to the extent necessary to guarantee the fundamental protection of due process of law.

"Evidence may be either direct or circumstantial." *State v. Jacobs*, 07–887, p. 12 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, 551, *writ denied*, 11–1753 (La.2/10/12), 80 So.3d 468, *cert. denied*, [568] U.S. [838], 133 S.Ct. 139, 184 L.Ed.2d 67 (2012). We note that, whether the conviction is based on direct evidence or solely on circumstantial evidence, the review is the same under the *Jackson v. Virginia* standard. *State v. Williams*, 33,881 (La.App. 2 Cir. 9/27/00), 768 So.2d 728 (citing *State v. Sutton*, 436 So.2d 471 (La.1983)), *writ denied*, 00–99 (La.10/5/01), 798 So.2d 963. Circumstantial evidence is that where the main fact can be inferred, using reason and common experience, from proof of collateral facts and circumstances. *Id.* Where the conviction is based on circumstantial evidence, in order to convict, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438.

In *State v. Chism*, 436 So.2d 464, 469 (La.1983) (citations omitted), the supreme court discussed the use of circumstantial evidence, stating:

> Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference by which a conclusion is drawn. Like all other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. There is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog passed by. The gist of circumstantial evidence, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion.

> Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or

> compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*State v. Williams*, 13-497, pp. 3-5 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, 1239-40, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024. "[W]hen the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification." *State v. Hughes*, 05-992, p. 5 (La. 11/29/06), 943 So.2d 1047, 1051.

The defendant was convicted of simple arson, which is "[t]he intentional damaging by any explosive substance or the setting fire to any property of another, without the consent of the owner and except as provided in [aggravated arson]." La.R.S. 14:52.

Mr. Babineaux testified that he owned the residence located at 415 Hubertville Road in Jeanerette, Louisiana, on June 19, 2016. At that time, he rented the residence to Ms. Johnlouis for $600.00 a month. The house was furnished with a washer, dryer, stove, refrigerator, couch, and love seat when Ms. Johnlouis rented it.

Mr. Babineaux testified he was at church at the time the house burned. Mr. Babineaux lost the following items in the fire: "the refrigerator, the range, washing machine, dryer, hot water heater, two air conditioning units, heat and cool units, 24,000 BTUs, and the dining room set." Mr. Babineaux stated those items cost $5,760.98. There was also structural damage to the home, and repairs were estimated at $20,657.00.

5

A few days before the fire, the defendant sought out Mr. Babineaux at one of his rental properties. The defendant asked Mr. Babineaux for a key to the Hubertville Road house. Although Mr. Babineaux was aware that the defendant lived at the home with Ms. Johnlouis, Mr. Babineaux denied the request because the house was rented to Ms. Johnlouis. This upset the defendant. Mr. Babineaux did not know if the defendant had any property inside the home.

Chief Clark was employed by the St. Mary Parish Fire Protection, District Number 11. He was the first firefighter to respond to 415 Hubertville Road on June 19, 2016, arriving at 8:31 a.m. The state fire marshal was notified because the fire was suspicious in nature.

Chief Clark concluded the fire was started on the outside of the home. He stated: "At the rear of the house where the 'V' pattern was, there was nothing capable of producing any type of heat or electrical arcing to start a fire." He explained a "V" pattern "basically, is the way the fire burns. Basically, fire burns up and out. Basically, where the 'V' pattern is [sic] where the fire normally would start. Once it goes up, it basically spreads out." Chief Clark found nothing structural in that area that would have caused the fire. Chief Clark testified the hot water heater was ruled out as the source of the fire. Chief Clark testified the state fire marshal concluded the fire was arson. Chief Clark did not find any accelerant or any kind of bottle at the scene of the fire.

During his investigation, Chief Clark found that a house located one street from the Hubertville Road residence had security camera footage from the night in question.[3] Although the video footage was of poor quality, it was played for the jury. At 8:05 a.m., a man in a green shirt walked down the street carrying

_____

[3]Chief Clark was shown a map and drew a circle around the location where the video footage was taken and a square around 415 Hubertville Road.

something in his hand. The man reappears at 8:08:40 a.m., walking in the direction he original came from, and his hands are empty.

Chief Clark identified the man in the video as the defendant, who was his second cousin. He claimed he immediately recognized the defendant. When asked what caused him to recognize the defendant, Chief Clark stated, "Walk, character, person's movement and everything like that." Chief Clark later testified, "The walk comes back to him." Chief Clark was sure the person he saw was the defendant. However, Chief Clark could not say what kind of hairstyle the man had or if he had facial hair. Chief Clark agreed that "the person on that video [was] coming from behind the Hubertville house."

Chief Clark was cross-examined about the video and evidence against the defendant as follows:

Q. Is it possible that it's not Katron on that video?

A. It can be possible. However, I've been in law enforcement and the fire service and know my people around town.

Q. But you say it's possible?

A. Yeah.
Q. You don't know if K. K. has a shirt like that?[4]

. . . .

A. I can't tell you what kind of shirt you have.

Q. Did you find any boots in his mom's house?

A. Never went to his mom's house.

. . . .

Q. Did you speak to the neighbor directly across the street?

A. No, I did not.

Q. Did you check out the victim in this case?

---

[4]The defendant was referred to as K.K. several times during trial.

A.     Check him [sic] out as in?

Q.     Do any investigation?

A.     No, I did not.

Q.     Did you verify that she was actually at work on June 19th?

A.     No, I did not.

Chief Clark testified he investigated a fire at the residence Ms. Johnlouis lived in in 2012. Chief Clark was asked if Ms. Johnlouis tried to blame the defendant for the 2012 fire, and he replied, "I cannot say she tried to blame him. I was never given that statement to who blamed who." The previous fire started in a closet, which did not contain any electrical appliances. No one was arrested for setting the fire.

Chief Clark spoke to Ms. Johnlouis at the Hubertville Road residence sometime after 9:12 a.m. He subsequently called the defendant. The defendant said he was at Iberia Medical with his ex-girlfriend. Chief Clark told the defendant the State Fire Marshal wanted to meet with him at the Jeanerette Police Department. The defendant told Chief Clark he would meet with the marshal. To Chief Clark's knowledge, the defendant did not do so. Chief Clark testified he never took a written statement from the defendant because the defendant never met with him. Chief Clark later learned the defendant had been in Jeanerette when he claimed he was at the hospital in New Iberia. Chief Clark did not tell the defendant he knew Ms. Johnlouis was not at the hospital.

Mr. Colbert was seventeen years old at the time of trial. On June 19, 2016, he was at his aunt's, Ms. Johnlouis's, house on Hubertville Road. Mr. Colbert had recently had surgery, and Ms. Johnlouis asked him to spend the night at her house. Mr. Colbert slept on the sofa, and Ms. Johnlouis did not get home until morning.

8

She called Mr. Colbert to open the house door for her. Mr. Colbert testified Ms. Johnlouis said, "she was scared to come in by herself, and [defendant] was outside and she wanted me to come meet her outside." When he let Ms. Johnlouis in, he saw the defendant. The defendant was "down the street at that time, like he was leaving." Ms. Johnlouis changed into her work clothes, and Mr. Colbert laid back down. Ms. Johnlouis woke him again when she left for work. After Ms. Johnlouis left, Mr. Colbert laid back down and went to sleep.

Mr. Colbert testified that he had asthma, and the smell of smoke woke him approximately an hour to an hour and a half after Ms. Johnlouis left. He used his phone's flashlight to see where the smoke was coming from. He then ran outside and called his mom, then Ms. Johnlouis, and then 911. Mr. Colbert indicated the house was burning from the backside.

Mr. Colbert viewed the video footage located by Chief Clark and identified the defendant as the man walking down the street. Mr. Colbert testified he recognized the defendant's walk. When asked what the significance of the man in the video looking at the camera was, Mr. Colbert stated, "You could have seen his face. Not clearly. But if you know him, like you know it was him." Mr. Colbert was sure it was the defendant in the video. He had known the defendant for ten years. He had seen the defendant wear a shirt like the man in the video and had seen him wear work boots.

Mr. Colbert testified he still spoke with the defendant and did not have any reason to be scared of him.

Corporal Travis Goudeau was employed with the State Fire Marshal's Office. He was accepted as an expert in arson investigation. Corporal Goudeau was called to investigate the fire at issue herein. He examined the structure to determine where and how the fire started.

9

Corporal Goudeau testified the heaviest damage was to the left side of the home, which was the kitchen. This area was depicted in state's Exhibit 8. Corporal Goudeau opined the fire started on the outside of the home in the grass. The interior received severe fire damage to the west side kitchen area. Corporal Goudeau determined the fire was an incendiary fire, which meant it was intentionally set. Corporal Goudeau reached that conclusion because there were no other causes in the area of origin, including electrical and mother nature. The photos introduced as state's Exhibit 6 showed a "V pattern," which indicated where the fire originated. He excluded the hot water heater as the source of the fire because the fire did not start near the hot water heater. The fire went up the outside west wall and into the house.

Corporal Goudeau did not find a bottle at the scene. He felt a bottle would have been consumed by the fire. Additionally, he did not find any accelerant, which could have evaporated or burned off. Corporal Goudeau testified this was not uncommon. Corporal Goudeau testified that testing for accelerant could be done by taking a sample and sending it to the crime lab, which he did not do, or by using a detection dog, which he did not have at the time of the investigation.

Upon Corporal Goudeau's arrival at the scene, Chief Clark told him the tenant had been having issues with her boyfriend. Shortly thereafter, Corporal Goudeau asked for the boyfriend's name.

Corporal Goudeau watched the video footage with Chief Clark at the residence where the cameras were located, and Chief Clark said he knew the man in the footage. Corporal Goudeau asked if Chief Clark was sure because the camera was approximately twenty-five feet from the road. According to Corporal Goudeau, Chief Clark identified the man's walk. Chief Clark then attempted to reach the defendant by phone. Corporal Goudeau never spoke to the defendant.

10

Corporal Goudeau waited at the police department for several hours, and the defendant never showed up. The defendant later spoke to Chief Clark and told him he was not in town. However, someone from the police department informed Corporal Goudeau he or she had seen the defendant in town. Corporal Goudeau then prepared a warrant for the defendant's arrest.

Ms. Johnlouis told Corporal Goudeau she was at work when the fire started. He did not corroborate her alibi, he was not aware that she previously reported a fire, and he did not check her phone records. His report indicated he took statements from Ms. Johnlouis and her neighbors but testified he must have taken Ms. Johnlouis's statement by phone.

Corporal Goudeau testified the video was probable cause for the defendant's arrest. Corporal Goudeau had not met the defendant before trial. Therefore, he had no idea what the defendant looked like. He said information in the arrest warrant came from Ms. Johnlouis and witnesses. The home of the defendant's mother was not searched, and he had no physical evidence linking the defendant to the crime.

Detective Latanuia Perry was employed by the Jeanerette Police Department on June 19, 2018, and was working as a patrolman. Detective Perry was monitoring traffic between 8:15 and 8:30 a.m. on Sixth Street, which was four blocks from 415 Hubertville Road, when the defendant approached her. At that time, the defendant said, "he did not start a fire." She had not heard about the fire at that time, since it was prior to the 911 operator dispatching officers to the residence.

While Detective Perry was speaking to the defendant, she saw a car pass at a high rate of speed. She pursued the car, and the driver eventually pulled over on Hubertville Road at the location of a fire. The driver was Ms. Johnlouis's sister.

11

Her son, Mr. Colbert, had been inside the burning residence and called 911. When the defendant told investigators he was out of town, Detective Perry noted she had just seen him.

Ms. Johnlouis's sister testified that Mr. Colbert spent the night at Ms. Johnlouis's residence on June 19, 2016. She said when she learned Mr. Colbert was in a house fire, she then drove to that residence. She was speeding at that time and was pursued by police. She arrived at the Hubertville Road residence, and it was on fire. Ms. Johnlouis was at work at that time. Later, someone picked Ms. Johnlouis up from work and brought her home. Ms. Johnlouis passed out at the residence. However, Ms. Johnlouis did not go to the hospital.

Ms. Johnlouis's sister testified that before she received the call about the fire, the defendant called her and said Ms. Johnlouis "never slept home." The sister testified she told the defendant he and Ms. Johnlouis were not together and to let it go. The defendant then said, "I got something for her[.]" The sister stated the call occurred at "five something in the morning[.]" She did not know if Ms. Johnlouis had been home that night or not.

Ms. Johnlouis testified that she lived at 415 Hubertville Road on June 19, 2016. She dated the defendant for over seven years. She said they were not dating when the fire occurred. The night before the fire, Mr. Colbert stayed at Ms. Johnlouis's home. However, she slept at a friend's house. She returned home a little after 7:00 a.m. to get ready for work and reported to work at approximately 7:59 a.m. When she pulled into her driveway that morning, she saw the defendant "flying from the back" part of the house. She subsequently testified as follows: "He then came to the window and beat on the window. He said, 'You slept to that nigga' house?' I said, 'Yeah, we don't go together.' I told him get away from the car before I call the police[.]" Ms. Johnlouis followed the defendant to his mother's

12

house because "he always likes to double-back."  She said she left when she saw him "[g]et in the yard."

> Ms. Johnlouis testified:

> I parked sideways so you could look towards the road.  You see him coming across the road, crossing the highway, and you see him walking down the sidewalk.  But he acted like he didn't see me (inaudible).  I called my sister and asked her [can] she call my nephew, and if he can go in the house, he was going to jail.  He didn't answer her phone call.  So I kept calling my nephew, Mar'Quise Colbert [sic] phone.

Mr. Colbert was inside Ms. Johnlouis's house sleeping.  Mr. Colbert eventually answered the phone, and she asked him to meet her outside because she was afraid of the defendant as he kept breaking into her house.  Ms. Johnlouis got ready for work, and Mr. Colbert walked her back outside.  Ms. Johnlouis then went to work, which was ten to twelve minutes from her home.  Ms. Johnlouis's time card indicated she arrived at work at 7:59 a.m. on June 19, 2016.

Mr. Colbert called Ms. Johnlouis and reported the house fire. While still at work, Ms. Johnlouis called the defendant and blamed him for the fire.  The call would have occurred between 7:59 and 8:30 a.m.  Ms. Johnlouis was eventually able to leave work.   When she arrived home, the fire was still burning.  She testified she passed out several times while there.

Ms. Johnlouis rented the house from Mr. Babineaux.  Ms. Johnlouis did not have insurance on her belongings and was not able to salvage anything due to smoke damage.  She said that just the bedroom furniture and televisions located therein were valued at over $4,000.00.

Ms. Johnlouis identified the man in the video footage as the defendant.  She was asked what stood out that made her realize the man was the defendant.  Ms. Johnlouis responded, "Toward the end of the video you could see him kind of look

when he's turned around and looked in the computer, and his walk, and the side of his face." She was sure the man in the video was the defendant.

Ms. Johnlouis testified that the defendant lived with her when she moved into the house. The defendant helped with rent and other bills, and the cable was in the defendant's name. She also testified that she had put all the defendant's belongings out of the house, including his deejay equipment.

Ms. Johnlouis testified that a few days before the fire, the defendant broke into the house and "broke [Ms. Johnlouis's] stuff." She denied throwing the defendant's phone against the wall. She spoke with police about the incident. Ms. Johnlouis denied trying to get the defendant to return to her residence.

Ms. Johnlouis acknowledged she had a house fire in 2012. She said the defendant's best friend told her the house was on fire. She and the defendant had broken up, and Ms. Johnlouis was at her parent's house. She said the defendant was home at the time. Ms. Johnlouis denied writing a letter impersonating the defendant's mother and paying someone to set fire to the home of the defendant's best friend. Ms. Johnlouis admitted she had been convicted of felony theft in 2009.

The defendant's mother, Elizabeth Moten, testified that the defendant was living with her at the time of the fire, and her home was located two blocks from Ms. Johnlouis's house. The night before the fire, the defendant's girlfriend Wannie picked him up between 6:00 and 7:00 p.m., and she dropped him off at 5:00 a.m. Moten knew this because her alarm chimed when the door was opened, and she said she is a light sleeper. If the defendant had left again, she said she would have heard another chime. Moten testified she woke up at 8:00 a.m. Her phone rang at 8:10 a.m., and Jamie asked if she and the defendant were okay because his house was on fire. Ms. Moten then walked into the living room where the defendant was sleeping. She woke him and told him about the fire. She said

14

the defendant told her his deejay equipment was in that house, and Moten instructed him to go see what was going on. The defendant then left.

Ms. Moten had viewed the video footage and testified the man in that footage was not the defendant. Her home was not searched by police. Ms. Moten testified that Ms. Johnlouis kicked the defendant out of the Hubertville Road residence months before the fire, and he took his deejay equipment at that time. However, she said he brought it with him when he moved back in with her. Ms. Johnlouis kicked him out again two weeks before the fire. Ms. Moten testified the defendant's deejay equipment was in Ms. Johnlouis's house at the time of the fire. Ms. Moten then testified the deejay equipment was outside Ms. Johnlouis's residence two weeks before the fire, but the two reconciled.

Ms. Moten testified she did not know what time the defendant went to the hospital on the day of the fire, as she was at a family gathering. He was also at a family gathering for a short time. The defendant told her "later on" that he had gone to the hospital. She said she did not know why he was at the hospital.

Jamie Buteau testified she had known defendant for fourteen years and worked with his mother. On June 19, 2016, she woke up to her dogs barking. She opened her door and was told by a neighbor that the yellow house on Hubertville Road was on fire. She then called the defendant's mother to see if everyone was okay. Police later came to her residence and questioned her about her security cameras. Defense Exhibit 2 depicted where her house was in relation to the house on Hubertville Road, and the direction the camera faced was represented by an arrow. Her camera did not show Hubertville Road. Ms. Buteau was asked how far the Hubertville Road residence was from her home and testified: "We would have to walk up a half block to the left, then turn about another half a block, and that would be Hubertville Road at that intersection." The house at issue was probably

15

three houses down from the intersection. She said she did not know who the man in the video was. It appeared the man was holding something, but she did not know what it was.

Keye'Juana Marks testified the defendant was her fiancé, and she had known him more than six years. At the time of the fire, she said she and the defendant were "friends for benefits" or "still [her] boyfriend." Ms. Marks and the defendant have a six-year-old son together. She was with the defendant the night before the fire. The defendant called her to pick him up around 3:15 p.m. She dropped him off at 6:00 p.m. because he was to deejay. Around 9:30 p.m., she picked the defendant up again. She dropped him back off at his mother's house at 5:30 the next morning. Ms. Marks testified the defendant called her around 7:00 a.m. and told her a friend called his mother and said the house was on fire. Ms. Marks said she told the defendant that Ms. Johnlouis would say he set the fire.

Ms. Marks said the man in the video was definitely not the defendant, as the defendant was not that slim. Additionally, she said she had never seen the defendant wear a green shirt like the one in the video. However, she acknowledged the defendant had work boots. She testified his boots were brown and did not have a heel on them.

When asked if there was anything about Ms. Johnlouis around the time of the fire that concerned her, Ms. Marks stated, "She was crazy. She used to play on my phone. She used to threaten me. She wished my child died and all that."

The defendant contends the state failed to prove he set the fire. He notes no one observed the fire being set. Additionally, no one saw him in the area at the time the fire was being set, and no physical evidence linked him to the fire. The defendant further contends the case was based on circumstantial evidence, and the state's smoking gun was a video of poor quality.

The defendant asserts there is a reasonable hypothesis of innocence in that someone else could have set the fire or the fire might not have been arson at all. He then discusses the lack of direct evidence and the insufficiency of the investigation.

We will first address the defendant's claim that the state did not prove the fire at the Hubertville Road residence was arson. Corporal Goudeau concluded the fire was not caused by natural causes or an electrical problem. Thus, it was set intentionally. However, there was no testing for accelerants.

In *State v. Lindsey*, 46,313 (La.App. 2 Cir. 5/18/11), 69 So.3d 566, the defendant was convicted of aggravated arson. On appeal, he argued the state failed to prove the fire was the result of a criminal act–that the fire was deliberately set or was not of accidental origin. The fire marshal found no evidence of the use of accelerants in the fire, and no witnesses saw defendant set the fire. In addressing the evidence, the second circuit noted the absence of forensic proof of arson was not fatal to the case against the defendant.

In *State v. Duperon*, 12-810 (La.App. 1 Cir. 12/21/12) (unpublished opinion), St. Tammany Parish fireman Donald Estes testified as an expert in arson investigation. In his opinion, the fire at 826 Gause Boulevard West had been set intentionally, but no combustible liquids or accelerants were used to start the fire. Further, he stated that if the fire had not been spotted when it was, the entire structure would have erupted into flames quickly. For that reason, he concluded that the fire had only been burning for a short period of time. Estes also testified that the fire could have been started with a lighter alone. In addressing the defendant's claim that the state failed to prove a criminal act occurred, the court stated: "[Estes's] uncontroverted testimony was itself sufficient to allow the jury to conclude that the fire occurred as a result of someone's criminal act." *Id.* at 4.

17

In *State v. Purvis*, 16-816 (La.App. 3 Cir. 4/12/17), 217 So.3d 470, the defendant was convicted of aggravated arson. At trial, Deputy State Fire Marshall Allen Jones, who was accepted as an expert in fire inspection and arson investigation, testified as follows:

> Deputy Jones investigated the fire and stated there was not much of the trailer left as the fire had engulfed the entire structure. He was not able to use burn patterns because of the severity of the fire but determined the fire started on the front porch based on the corroborating statements of witnesses and first responders. Deputy Jones testified there was no inclement weather on the day in question that would have produced lightning. Deputy Jones also ruled out the bug zapper theory as the fire's origin given his knowledge of the devices by stating: "[T]hey are not designed to produce heat. They are designed to electrocute small bugs. That is an electrocution thing, it is not a heat thing." Deputy Jones determined the fire was intentionally set. However, he was not able to determine the cause of the fire because "there was very little physical evidence remaining . . . on the property[.]" Deputy Jones testified that after excluding every other reasonable hypothesis, he obtained a warrant for the defendant's arrest for aggravated arson. On cross-examination, Deputy Jones testified that Defendant said there was no gas on the property.

*Id.* at 476-77. On appeal, the defendant asserted the state failed to sufficiently prove that he acted intentionally when setting the fire that destroyed his home rather than it resulting from an accident. The defendant argued:

> Defendant contends that Deputy Jones guessed about what happened without examining the physical evidence, and his conclusions were based on interviews with witnesses who did not see how the fire was started. Defendant asserts that Deputy Jones failed to consider other accidental possibilities, such as a short in the wiring on the front porch. Defendant points out that Deputy Jones ruled out the bug zapper as the cause of the fire based on his knowledge that bug zappers do not produce heat, but failed to offer any testimony indicating that tests were actually performed in order to determine whether the bug zapper caused the fire.

*Id.* at 479. This court found the defendant waived any claim regarding Deputy Jones' testimony or reliance on statements and his testimony regarding his knowledge of bug zappers. The court went on to affirm the defendant's

conviction, stating: "At trial, the State established the occurrence of a criminal act through Deputy Jones' testimony that the fire was intentionally set." *Id.* at 481.

We find the testimony of Corporal Goudeau was sufficient for the jury to conclude the fire at the Hubertville Road residence was intentionally set.

The defendant further claims that the evidence was insufficient to prove he set the fire.

Testimony indicated that some time prior to the fire, Ms. Johnlouis kicked the defendant out of the residence. The defendant subsequently asked Mr. Babineaux for a key to the residence, and Mr. Babineaux refused.

Ms. Marks dropped the defendant off at his mother's residence around 5:00 a.m. on June 19, 2016. The defendant called Ms. Johnlouis's sister around five that morning, telling her Ms. Johnlouis did not sleep at home, and "I got something for her." The defendant's mother said he did not leave the residence until after she notified him of the fire at approximately 8:10 a.m. after receiving a call from Ms. Buteau. Ms. Marks said the defendant called her about the fire around 7:00 a.m. Ms. Johnlouis and Mr. Colbert both testified the defendant was at or near the Hubertville Road residence when Ms. Johnlouis went home to change clothes for work, which was a little after 7:00 a.m.

Chief Clark, Ms. Johnlouis, and Mr. Colbert identified the defendant as the person seen on a video at 8:05 a.m. blocks from the Hubertville Road residence. Between 7:59 and 8:30 a.m., Ms. Johnlouis called the defendant and blamed him for the fire. The defendant approached Detective Perry between 8:15 and 8:30 a.m. and said he did not start a fire. Chief Clark arrived at the residence at 8:31 a.m. The defendant evaded contact with Chief Clark and Corporal Goudeau and lied to Chief Clark about his whereabouts when contacted on the date of the fire.

19

In *State v. Combs*, 600 So.2d 751 (La.App. 2 Cir.), *writ denied*, 604 So.2d 973 (La.1992), the defendant was charged with simple arson after allegedly setting fire to a guesthouse. Several witnesses testified that shortly before the fire started they saw a man walking near the guesthouse carrying a container with a rag at its top. Although they could not make an in-court identification, two of the witnesses gave a description that generally matched the defendant. Another witness identified the defendant as the man he saw with the container. Further, the defendant had previously been ordered permanently off the premises by the victim and had made statements about having the victim's house burned. On appeal, the second circuit found that there was sufficient evidence to support the conviction.

Unlike *Combs*, the defendant was not seen at the Hubertville residence immediately before the fire, and he did not tell anyone that he intended to burn Ms. Johnlouis's residence. However, according to three witnesses in the case at bar, the defendant was near the Hubertville residence at 8:05 a.m. with what appeared to be a container in his hand, and fire personnel arrived at 8:31 a.m.

In *State v. Darce*, 613 So.2d 695 (La.App. 5 Cir.), *writ denied*, 620 So.2d 873 (La.1993), the defendant was accused of burning a vacant house across the street from his own. On the night of the fire, a neighbor was standing on his porch at 3117 43rd Street when he saw the defendant walk out of the side yard of 3121 43rd Street, the defendant's own home, cross the street, and walk behind 3120 43rd Street, which was next door to 3116, the house which was later burned. The witness thought the defendant dropped a cigarette lighter. The defendant was holding a cigarette and was stumbling. The witness then went into his own home, and when he came outside again ten or twenty minutes later, he saw that the house at 3116 43rd Street was on fire. The witness did not see the defendant come out from behind 3120, never saw him go into 3116, and did not see him after the fire.

Another witness went outside when he heard the fire truck. The defendant was running or walking from the direction of 43rd Street and was out of breath. The same witness saw the defendant at a nearby intersection over an hour later. That witness described the defendant as looking lost. Fire investigators determined that the fire at 3116 43rd Street was deliberately set in two different areas. However, there was no evidence of an accelerant, but instead available materials such as boxes had been used to start the fire. The investigator stated it would take approximately ten minutes after the fire was set for the flames to come out of the windows. After the defendant's arrest some three months later, he made a statement denying he had been on 43rd Street until almost two hours after the fire. He also presented testimony that he had left his home much earlier in the evening. In reversing the defendant's conviction, the fifth circuit noted there was no direct evidence of guilt. At best, the evidence established the defendant had been seen walking "in his own neighborhood around the time of the fire." *Id.* at 697. The court found "this latter behavior is not conclusive of guilt, since Mr. Darce was seen by two of his neighbors who were also out." *Id.* at 697-98. The court also found the defendant's inability to state, months after the incident, exactly where he was at the time of the fire was equally inconclusive. The court then found a rational fact-finder could not have found the defendant guilty beyond a reasonable doubt.

The case at bar is distinguishable from *Darce* in that there was testimony of acrimony between the defendant and Ms. Johnlouis. Ms. Johnlouis testified that the defendant called her, reporting Ms. Johnlouis had not slept at home the night prior to the fire, and he said, "I got something for her." Additionally, Ms. Johnlouis testified that when she returned home the morning of the fire she encountered the defendant, who beat on the window of her car because she had not slept at home.

21

In *State v. Jones*, 480 So.2d 437 (La.App. 4 Cir. 1985), the victim first met defendant eight days prior to the fire in her apartment. Although the defendant spent the night at the victim's residence several times, she never gave him a key, and she refused to let him move in with her. The day before the fire, the victim and her son returned home to discover the defendant had broken through the rear kitchen door by picking a defective lock. When the victim told the defendant to leave, he threatened her. After the defendant left, the victim had a peace bond issued for the defendant. That night, the victim and her children stayed with relatives. The next morning, the victim's neighbor heard someone knocking hard on the rear door of the victim's residence. About ten minutes later, the neighbor smelled smoke and opened the bathroom window. She looked out and saw the defendant running away from the apartment. Police found the rear door of the residence had been kicked in, and all of the burners on the gas stove had been turned on. The principal of the elementary school the victim's children attended testified the defendant went to the school between 9:00 and 10:00 a.m. on the day of the fire and requested the address of the children, claiming to be their step-father. His request was denied. The defendant denied asking to move in with the victim, breaking into her apartment, knowing the neighbor, and going to the school. He admitted he lied about his employment and was aware of the defective lock. He admitted to two prior convictions, but the state presented evidence of a third conviction. He also testified he was looking for work at the time of the fire. The fourth circuit affirmed his conviction for simple arson, stating:

> The facts show that the state produced evidence of the defendant's violence toward Ms. Jones the day before the fire; the defendant's knowledge about the defective lock on the rear door; the defendant's presence in the courtyard adjacent to Ms. Jones' apartment at the time the fire was set; and the defendant's presence at the school, which is near Ms. Jones' apartment, approximately one hour after the fire was set. Although the defendant denied many of

these facts, his credibility was seriously damaged by other witnesses' contradictory testimony, his admitted fabrication and inability to produce an alleged alibi witness. Unquestionably, the state presented sufficient evidence to prove beyond a reasonable doubt that the defendant was the person who set fire to Ms. Jones' apartment.

*Id.* at 439.

The case at bar is distinguishable from *Jones* because no one saw the defendant running from the Hubertville Road residence minutes after the fire started.

No witness saw the defendant light the fire. However, the jury's verdict indicates it concluded the witnesses who testified the defendant was at home from 5:00 a.m. until 8:10 a.m. were not credible and gave credence to testimony identifying the defendant as the man depicted in the video. This court cannot second-guess those credibility determinations. Using reason and common sense, the jury could have also concluded the defendant was in the area of the Hubertville Road fire at least twenty-three minutes before fire personnel arrived at that residence. Furthermore, the defendant threatened Ms. Johnlouis and lied about his whereabouts when he spoke to Chief Clark. Viewing the evidence in the light most favorable to the prosecution, we conclude the evidence at trial was sufficient for the jury to find the defendant set the fire at the Hubertville residence beyond a reasonable doubt. His conviction is therefore affirmed.

**ASSIGNMENT OF ERROR NO. 2**

In his second assignment of error, the defendant contends the sentence imposed is excessive.

In *State v. Rexrode*, 17-457, pp. 3-4 (La.App. 3 Cir. 11/15/17), 232 So.3d 1251, 1253-54, this court discussed the standard of review for excessive sentence claims:

Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43 (citing *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99), 746 So.2d 124, *writ denied*, 00-165 (La. 6/30/00), 765 So.2d 1067).

. . . .

"[Louisiana] Const. art I, § 20, guarantees that, '[n]o law shall subject any person to cruel or unusual punishment.'" *Barling*, 779 So.2d at 1042-43. "To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering." *Id.* at 1042 (citing *State v. Campbell*, 404 So.2d 1205 (La.1981)).

The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *Barling*, 779 So.2d at 1042-43 (citing *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, *cert denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996)). In reviewing the defendant's sentence, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. "[T]he appellate court must be mindful that the trial court is in the best position to consider the aggravating and mitigating circumstances of each case. . . ." *State v. Williams*, 02-707 (La.App. 3 Cir. 3/5/03), 839 So.2d 1095, 1100 (citing *Cook*, 674 So.2d 957).

The defendant was convicted of simple arson where the damage done amounted to $500.00 or more. That crime was committed on June 19, 2016. At that time, the offense was punishable by a fine of not more than fifteen thousand dollars and imprisonment at hard labor for not less than two nor more than fifteen years. La.R.S. 14:52(B) (before 2017 amendment).

The state subsequently submitted documents from case number 11-1292, which indicated the defendant pled guilty on February 29, 2012, to felony possession of stolen property and was given probation under La.Code Crim.P. art.

894. That probation was revoked on May 22, 2013, and the rule to show cause indicated "he basically didn't do anything that was required of him." The state next introduced documents from case number 13-0783, indicating the defendant pled guilty to two misdemeanors, simple obstruction of a highway and resisting an officer, on December 9, 2013. Imposition of sentence was suspended under La.Code Crim.P. art 893, and the defendant was placed on probation. That probation was later revoked on July 10, 2015, as the defendant failed to do anything other than pay $50.00 of the money owed. The state also submitted Ms. Johnlouis's victim impact statement and a letter written by the defendant.

The defendant introduced letters from Kadejah Moore, his former classmate; Ms. Marks, his fiancé; Cora Clay, a bus driver from Iberia Parish; and Elizabeth Moore, Ms. Marks' mother; and Mr. Babineaux's victim impact statement, in which he stated he wanted the defendant to be sentenced to the full extent of the law, but he would be satisfied with receiving restitution.

The defendant testified he had two sons and shared joint custody of one of them. His other son was sick, and the child's mother, Ms. Marks, worked nights. Thus, the defendant felt he should be home with his son. Prior to being incarcerated, he worked at Estis Refactory in Jeanerette. The defendant stated his job would be available if he was released. Furthermore, he was willing to compensate the victims for their losses. The defendant testified he did a lot for the community. He felt he should receive probation. He explained his previous probation revocations, indicating he was young and irresponsible at that time. He went on to deny his guilt in the case *sub judice*.

Holly Williams, the human resources manager for Estis Refractory and Insulation, was called to testify. She indicated the defendant was a general laborer and a good worker. The defendant arrived early and took care of the crew he was

25

on, making sure the crew had rides to work and attended training. Williams indicated the defendant was up for a promotion and raise at the time he was arrested. If the defendant was released, he still had a job at Estis.

Ms. Buteau had known the defendant for fourteen years. He was friends with her and her husband. The defendant visited their home, and the defendant's son was her student. Ms. Buteau testified that if something was needed for the classroom, the defendant volunteered, donated, or did whatever was necessary. Ms. Buteau was not aware of the defendant's criminal record.

Ms. Moten, the defendant's mother, testified the defendant's father had never been a part of his life. The defendant quit school in eleventh grade to take care of his children. He always worked, including mowing lawns, washing cars, working at a sugar mill, and working offshore. Ms. Moten testified the defendant always performed community service. He helped out at church anytime repairs were needed, and he deejayed events, sometimes free of charge. She felt the defendant would do well on probation because he wanted to be a part of his children's lives. As he matured, he became more responsible. She felt he would pay restitution.

Ms. Marks, the defendant's fiancé, had a son with the defendant. Their son had been diagnosed with Kawasaki disease, and he had a heart murmur and chronic bronchial asthma. When the child was diagnosed, he spent three weeks in the hospital, and the defendant was present the whole time. The defendant often drove them to doctor's appointments in Lafayette. She said if the defendant was released, he would live with her.

Carol Bourgeois was a deacon at First Church of God in Christ in Jeanerette. He testified he had known the defendant since the defendant was eleven years old. Mr. Bourgeois described the defendant as a fine young man. The defendant was

26

active in the community and had provided free deejay services for activities involving children. Mr. Bourgeois testified community service opportunities would be available to the defendant if he was placed on probation. Mr. Bourgeois did not think the defendant would harm anyone in the community. Mr. Bourgeois asked for leniency in sentencing the defendant. However, he said he had no knowledge of the defendant's felony conviction or of his probation revocations.

Mr. Colbert testified at the sentencing hearing, repeating testimony from trial. Mr. Colbert stated he was not scared of the defendant but was not comfortable enough to ask him for money.

After the witnesses and evidence were presented, the state informed the trial court that the sentencing range was a fine of not more than fifteen thousand dollars and a sentence of up to fifteen years at hard labor. The state then argued the defendant could not receive a probated sentence because simple arson was a crime of violence under *State v. Oliphant*, 12-1176 (La. 3/19/13), 113 So.3d 165, in which the supreme court noted the list of crimes of violence set out in La.R.S. 14:2(B) was illustrative and found negligent homicide was a crime of violence. The state further asserted: "The district attorney has not orally or by writing designated it not to be [a] crime of violence, so therefore, we're going backwards to Article 893, the defendant is not entitled to a probated sentence."

Defense counsel argued the defendant qualified "for probation legally." Counsel then asserted simple arson was not a crime of violence.

The trial court found there was a significant risk of death, as someone was home when the fire started, and there was significant damage to the home and its contents. The court continued:

> I find that a lesser sentence would deprecate the seriousness of the offense and I find that you have not been responsive to probationary treatment on two prior past occasions, once as a

27

misdemeanor and once as a felony, both of which could have expunged from your record had you completed the probation. But you didn't do it. I find that a lesser sentence than what I'm going to impose would deprecate the seriousness of the offense.

. . . I sentence Mr. Richard to eight years at hard labor. I refer him to the Department of Corrections for execution of this sentence.

The court subsequently made a recommendation for work release.

In brief to this court, the defendant contends that while his sentence falls within the zero to fifteen year sentencing range and the trial court considered some of the factors set forth in La.Code Crim.P. art. 894.1, his sentence was not adequately tailored for him and consequently must be set aside. The defendant notes he failed twice at probation but argues he has become more responsible. Counsel suggests that paying $44,000.00 to the people injured as a result of the offense would serve as a constant reminder of how serious the offense is as well as ensure the victims do not have to wait to be compensated.

The state contends the defendant's sentence is not excessive, noting the sentencing range for simple arson is a fine of not more than fifteen thousand dollars and imprisonment for up to fifteen years at hard labor.

All attorneys at the district court and appellate court levels incorrectly set forth the applicable sentencing range. As previously noted, the sentencing range for simple arson at the time of the offense in 2016 was a fine up to fifteen thousand dollars and two to fifteen years imprisonment at hard labor. Louisiana Revised Statutes 14:52(B) was amended by 2017 La. Acts No. 281, § 1 and now reads: "Whoever commits the crime of simple arson, where the damage done amounts to five hundred dollars or more, shall be fined not more than fifteen thousand dollars and imprisoned at hard labor for not more than fifteen years."

This court has consistently held that the law in effect at the time of the commission of the offense is determinative of the penalty which the convicted accused must suffer. *State v. Wright*, 384 So.2d 399,

28

401 (La.1980). A defendant must be sentenced according to sentencing provisions in effect at the time of the commission of the offense. *State v. Narcisse*, 426 So.2d 118, 130–131 (La.1983). "The mere fact that a statute may be subsequently amended, after the commission of the crime, so as to modify or lessen the possible penalty to be imposed, does not extinguish liability for the offense committed under the former statute." *Id.*

*State v. Sugasti*, 01-3407, pp. 4-5 (La. 6/21/02), 820 So.2d 518, 520.

Louisiana Code of Criminal Procedure Article 890.1 provides for the waiver

of minimum mandatory sentences as follows:

A. Notwithstanding any other provision of law to the contrary, if a felony or misdemeanor offense specifies a sentence with a minimum term of confinement or a minimum fine, or that the sentence shall be served without benefit of parole, probation, or suspension of sentence, the court, upon conviction, in sentencing the offender shall impose the sentence as provided in the penalty provisions for that offense, unless one of the following occurs:

(1) The defendant pled guilty pursuant to a negotiated plea agreement with the prosecution and the court, which specifies that the sentence shall be served with benefit of parole, probation, or suspension of sentence or specifies a reduced fine or term of confinement.

(2) In cases resulting in trial, the prosecution, the defendant, and the court entered into a post-conviction agreement, which specifies that the sentence shall be served with benefit of parole, probation, or suspension of sentence or specifies a reduced fine or term of confinement.

B. If such agreements are entered into between the prosecution and the defendant, the court, at sentencing, shall not impose a lesser term of imprisonment, lesser fine, or lesser period of sentence served without benefit of parole, probation, or suspension of sentence than that expressly provided for under the terms of the plea or post-conviction agreement.

. . . .

E. At the time the sentence is imposed pursuant to this Article, the Uniform Commitment Sentencing Order shall specify that the sentence is imposed pursuant to the provisions of this Article.

29

There was no agreement on the record waiving the minimum mandatory sentence in this matter, and the section of the commitment order addressing Article 890.1 was not filled out.

In *State v. Preston*, 47,273 (La.App. 2 Cir. 8/8/12), 103 So.3d 525, the trial court incorrectly stated that the defendant's sentencing range was six to twenty years imprisonment when in reality the range was three and a third to ten years. On appeal, the second circuit ruled that a seven-year sentence was not excessive under the circumstances where "nothing in this record convinces us that the trial court intended to impose a lenient sentence for this defendant." *Id.* at 535.

In *State v. Davis*, 48,512 (La.App. 2 Cir. 11/20/13), 128 So.3d 1230, the trial court incorrectly stated during sentencing that the minimum sentence under La.R.S. 40:967(B)(4)(b) was ten years when the minimum was actually two years. The second circuit noted the defendant's twenty-year sentence was within the applicable sentencing range of two to thirty years. The court further stated: "Although the trial court wrongly stated that the minimum sentence was ten years, this was harmless error because the trial court did not manifest an intention to give a sentence near the statutory minimum." *Id.* at 1234 n.3. *See also State v. Barrose*, 468 So.2d 35 (La.App. 5 Cir. 1985).

Based on the above-cited cases, we find the attorneys' reference to the incorrect sentencing range was harmless, as there was no indication the trial court intended to impose a sentence near the statutory minimum.

The defendant argues his eight-year sentence is excessive. "In considering the nature of the offense, both the trial court and reviewing court may assess whether the crime for which the defendant has been convicted adequately describes his conduct when the conviction is for a lesser included responsive offense to the crime charged." *State v. Lewis*, 09-1404, p. 8 (La. 10/22/10), 48 So.3d 1073, 1078.

30

The defendant was charged with aggravated arson but found guilty of simple arson. "The gravamen of the offense of aggravated arson is the endangering of human life; whereas the gravamen of the offense of simple arson is the damaging of the property of another without his consent." *State v. Murphy*, 214 La. 600, 604, 38 So.2d 254, 256 (1948). Mr. Colbert was asleep inside Ms. Johnlouis's residence when the fire started. Thus, it was foreseeable that human life was in danger, and the crime for which the defendant was convicted did not adequately describe his conduct.

At the time of sentencing, the defendant was a twenty-four-year-old second offender who had not responded well to felony or misdemeanor probation. However, he had been gainfully employed prior to the offense and was helping care for one of his sons and had joint custody of his other son.

In *State v. Terracina*, 430 So.2d 64 (La.1983), the defendant solicited two co-conspirators to set fire to a grocery store, which the three did. The defendant was convicted of simple arson with damage over $500.00 and sentenced to seven and one-half years at hard labor. The supreme court addressed the defendant's excessive sentence claim stating: "Considering the circumstances of the offense, the seriousness of the offense, defendant's actions and attitude after the arson was committed, defendant's criminal history and the fact that defendant could have received a total of fifteen years at hard labor, the sentence imposed is not excessive." *Id.* at 68. The supreme court did not explicitly discuss the defendant's criminal history.

In *State v. Landry*, 502 So.2d 281 (La.App. 3 Cir.), *writ denied*, 508 So.2d 63 (La.1987), the defendant was convicted of simple arson with damages amounting to $500.00 or more after setting fire to the duplex where his estranged

31

wife and daughter lived. He was sentenced to nine years at hard labor. This court affirmed that sentence.

In *State v. Garner*, 511 So.2d 100 (La.App. 3 Cir. 1987), Ms. Johnson brought a man home with her at 11:30 p.m. They went to bed shortly thereafter. At midnight the defendant knocked on Ms. Johnson's door. Fearful of the defendant, Ms. Johnson did not answer the door. The defendant walked around the house and opened a bedroom window. At this point, Ms. Johnson shot a gun through the door, and, fearing for their safety, she and the man left the house soon thereafter. Ms. Johnson did not see the defendant as she fled. Within moments, the house went up in flames and resulted in a total loss of $14,449.00. The defendant was charged with aggravated arson but entered a plea of guilty to the lesser offense of simple arson with damage over $500.00. He was sentenced to fifteen years at hard labor. This court affirmed the sentence, stating:

> In this instance, the sentencing judge considered the defendant's lack of prior criminal history. However, the trial judge felt the defendant's crime warranted the maximum sentence from the seriousness of the offense and the defendant's lack of concern for endangering human life. Additionally, the judge considered the defendant's plea agreement and his reduced exposure to a harsher sentence than the one imposed.

Considering the nature of the crime, the defendant's status as a second offender, and sentences imposed in similar cases, we find the trial court did not abuse its discretion when imposing an eight-year sentence. Accordingly, this assignment of error lacks merit.

## CONCLUSION

The defendant's conviction and sentence are affirmed. The trial court is directed to inform the defendant of the correct provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the

rendition of this opinion and to file written proof in the record of the proceedings that the defendant received the notice.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**